RICHARD TYNER and Others v. RICHARD VARIEN and Another.[1]

January 26, 1906.

Nos. 14,523—(91).

**Will—Undue Influence.**

T. left a will by which, after providing for his wife during her life, he left practically all his property to the relatives of his second wife, to the exclusion of his own children. Upon an appeal from an order admitting the will to probate, it is *held* that the evidence was sufficient to show that the instrument in question was the result of undue influence exerted by the wife.

The probate court for Dakota county having made an order denying an application to admit to probate the will of John Tyner, deceased, over the objections of the sons of decedent, the defendants, proponents of the will, appealed to the district court for that county. The case was tried before Crosby, J., who made findings sustaining the will and reversing the order of the probate court. From a judgment entered pursuant to the findings, plaintiffs appealed. Reversed and new trial granted.

*H. H. Gillen,* for appellants.

*Frederick N. Dickson,* for respondents.

ELLIOTT, J.

This is an appeal from a judgment of the district court, sustaining the will of John Tyner after the probate court had refused to admit it to probate.

John Tyner died testate, November 10, 1903, at the age of eighty-seven, leaving as heirs at law three sons, Richard, Thomas, and John, one daughter, Rebecca O'Leary, the children of two deceased daughters, and his wife Margaret. The will in question was executed July 2, 1891. The property consists of one hundred sixty acres of land in Dakota county, Minnesota, and personal property of about the value of $4,500. Under the will Richard, Thomas, and John receive $2.50 each. To the wife, Margaret, is given

[1] Reported in 106 N. W. 898.

> All the rest, residue, and remainder of my property, real, personal, or mixed, of which I may die seised or possessed, to have and to hold the same for and during the term of her natural life, and to use, as she may deem best, and hereby authorize my said wife to dispose of any of the personal effects and convert the same into money and to use so much of the money as may be necessary for her comfortable support.

After the death of the wife, Rebecca O'Leary, the daughter, and Mary A. Bird, a niece, are given $500 each

> Out of moneys and credits, if so much remains after the payment of all claims and the expenses of the last sickness of myself and wife.

Other small bequests were made, but they are not important as far as this appeal is concerned. After the death of Margaret Tyner, all the land owned by John Tyner is given to Richard and William Varien, the nephews of the wife, Margaret. The result is that Margaret Tyner is given the use of the land and of all the personal property during her life, and at her death the land goes to her nephews, to the entire exclusion of the children of the testator. The contestants, the children of the testator, contend that the will is the result of undue influence exercised by Margaret Tyner, the wife of the testator.

1. The right to dispose of property by will is the creature of positive law, but it is carefully guarded and protected. A person who has testamentary capacity may make such a disposition of his property as conforms to his ideas of justice and propriety. He may be guided by lofty and beneficent motives, or by sordid prejudice and personal dislike. The justice and righteousness of his final dealings with those who are the natural objects of his bounty and toward whom he has assumed solemn duties and obligations are to be determined by the final judge of all human conduct. Subject to very limited statutory restrictions, the power of testamentary disposition is absolute.

But a valid will must be the result of the voluntary act of the testator, and not merely express the will of some other person. The wife, and other possible objects of his bounty, may properly influence his actions; but this influence must not be so great as to destroy his

power of will. The words "undue influence" carry with them their own limitation. The influence must not be undue. To constitute undue influence the testator must be so influenced by persuasion, pressure, or fraudulent contrivance that he does not act intelligently or voluntarily and is subject to the will and purpose of another. It may be exerted through threats, fraud, importunity, or the silent, resistless power which the strong often exercise over the weak or infirm. It must be sufficient to destroy his free agency and substitute the will of another for that of the testator. Entreaty, importunity, or persuasion may be employed, as may appeal to the memory of past kindness and the calls of the distressed. Mere suggestions or advice addressed to the understanding or judgment of the testator never constitute undue influence; neither does solicitation, unless the testator is so worn out with importunities that his will gives way. Robinson v. Robinson, 203 Pa. St. 400, 53 Atl. 253.

The fact that the will is inofficious, harsh, and unjust is not in itself evidence that it was induced by undue influence. Mitchell v. Mitchell, 43 Minn. 73, 44 N. W. 885. Nor is the fact that the beneficiary under the instrument had special opportunities to exert undue influence over the testator. But when there is evidence, independent of any question of inequality in the will, tending to show acts of undue influence over the testator to procure the will on the part of, those who appear to have been preferred, the fact that the distribution of property is grossly unequal and unjust may be received to strengthen the evidence of undue influence. In re Storer's Will, 28 Minn. 9, 8 N. W. 827; In re Nelson's Will, 39 Minn. 204, 39 N. W. 143; Mitchell v. Mitchell, supra; Schmidt v. Schmidt, 47 Minn. 451, 50 N. W. 598; In re Hess' Will, 48 Minn. 504, 51 N. W. 614, 31 Am. St. Rep. 665; Clarity v. Davis, 92 Minn. 60, 99 N. W. 363; Fischer v. Sperl, 94 Minn. 421, 103 N. W. 502; Mackall v. Mackall, 135 U. S. 167, 10 Sup. Ct. 705; Manatt v. Scott, 106 Iowa, 203, 76 N. W. 717, 68 Am. St. Rep. 293.

Generally the burden of showing that a will was procured by undue influence rests upon those who assert the fact; but when the contestants have made a prima facie case, by the production of evidence from which the presumption of undue influence arises, the burden is then

upon the proponents to show that the instrument is the will of the testator. It is not very material whether we say that in such a case the burden shifts, or that the evidence produced, aided by the presumption which arises therefrom, is evidence sufficient to make a prima facie case. Coffin v. U. S., 156 U. S. 432, 15 Sup. Ct. 394, 39 L. Ed. 481; 1 Elliott, Ev. § 92; Thayer, Prelim. Treat. Ev. 551. What is meant is that a point is reached when the contestant prevails unless the proponent assumes the obligations of going forward with his evidence. Fischer v. Sperl, supra, and cases there cited; Small v. Champeny, 102 Wis. 61, 78 N. W. 407; Doyle v. Welch, 100 Wis. 24, 75 N. W. 400; Disch v. Timm, 101 Wis. 179, 77 N. W. 196; Rivard v. Rivard, 109 Mich. 98, 66 N. W. 681, 63 Am. St. Rep. 566; Fisher v. Bishop, 108 N. Y. 25, 15 N. E. 331, 2 Am. St. Rep. 357, note; Clarity v. Davis, supra.

In the light of these general principles we proceed to a review of the evidence. It is not possible to set out all the testimony; but a very brief summary will be sufficient to show that the contestants fulfilled all the requirements necessary to make a prima facie case of undue influence, and that it was not overthrown by the evidence offered by the respondent. John Tyner's first wife died in 1866, and within two months thereafter he married Margaret Varien. When the second wife came into the family, she found four children, all under eighteen years of age. Almost from the beginning the family life was unhappy. She evidently took a dislike to the children, and soon began a systematic effort to drive them from the home. In this she was ultimately successful. The children were frequently whipped by the father at her request. They were not allowed the food which was supplied to the other members of the family. They were deprived of proper and necessary clothing and schooling and seem to have been generally illtreated. One of the boys returned home on two occasions and was refused admission by his stepmother. Another farmed the land for two years, but finally left because of trouble with Margaret. A few years later the father sent for him, and he made another attempt to run the farm, with the same result. She disliked them, and was determined that they should not be at home with their father. It clearly appears that the boys were driven from home by the continuous ill treatment of

Margaret Tyner.  During the last illness of John Tyner his wife would not permit reports of his condition to be sent to his absent children, and she prevented the news of his death reaching them until it was too late for them to attend the funeral.  There is no evidence that the children were to blame, and in view of the age and relation of the parties it should not be presumed.  John Tyner was an illiterate man, unable to read or write.  He seems to have had some natural capacity for acquiring and retaining money, which he concealed about the premises in old tomato cans.  The testimony shows that Margaret was much the stronger character, and generally had her way about household and business affairs.  She had some education, and her husband, as is usual in such cases, overestimated the importance of a little book learning.  He was so deaf that it was necessary for her to be with him when he transacted any business and do most of the talking.  He seems to have relied largely upon her for his information and trusted to her judgment.  She was persistent, energetic, and resourceful.  Like her husband, she was in the habit of drinking, and they frequently went to town and got drunk together.

The property and its final disposition seems to have been continually in her mind, and from the first she determined that the children should never have the land.  She told the neighbors that the land had been promised to her brother's children.  She kept everlastingly talking to her husband about the worthlessness of the boys, and accused them of being lazy, thieving, and shiftless.  Her purpose, it may fairly be assumed, was to so prejudice his mind against them that he would cast them off and leave his property to others of her choosing.  She told the neighbors that the children should not have the land.  When the will was made Margaret was with the testator, making suggestions and doing part of the talking.  After it was made she expressed her approval of its contents, and from that time until the death of John Tyner she exerted her influence to prevent him from becoming reconciled to the children and changing the will.  She said "the will was made the way she wanted it, and was not going to be changed."  It is apparent that she earnestly desired to influence her husband in the making of his will, and that she was induced to do this by her dislike of the children and her desire to have the land go to her own relatives.  She was

also to some extent personally benefited by the will, as she received all the law would give her, and in addition thereto she was given complete control over all the personal property during her life.

But the ultimate question is whether her influence actually induced the will. It is certain that it was exerted for the purpose of controlling the making of the will and the disposition of the property. John Tyner stated to disinterested parties that Margaret would not permit him to leave the land to the children. He told the witness Flannery that he gave the boys nothing, because Margaret did not want them to have anything. He also told Mrs. Joego that he was not going to give any of the land to his children, because Margaret "would not allow him to." The same statement was made to Mary Tyner. All of this evidence stands uncontradicted. Margaret was present at the trial, but was not called as a witness. John Tyner's wife and children were the natural beneficiaries of the property, and there is nothing to show that the children were not deserving of his consideration. The attempt to show that they had improperly left home and neglected their father failed completely. There being evidence of this character in the case, the inofficious, harsh, and inequitable character of the will may also be taken into consideration. The Variens, who received the homestead, are not of the blood of the testator, but are the nephews of his wife. As far as the record shows they had never done anything for John Tyner, except farm the land for a time, nor was he under any obligation to them. The evidence thus presents a much stronger case than appeared in Clarity v. Davis, 92 Minn. 60, 99 N. W. 363, where Chief Justice Start, speaking for the court, said: "In view of these admitted facts and the relation existing between the legatee and the testator, the claim of the appellants that the burden was upon the respondent to show by clear and satisfactory evidence that the testator was mentally competent to make his will and that its execution was not procured by any undue influence or fraud is, as it must be, conceded by the respondent."

Judgment reversed and new trial granted.