### E. H. GOODLOE v. J. H. GOODLOE ET AL.

#### Decided November 16, 1907.

**1.—Will—Undue Influence—Evidence.**

In a suit to set aside a will and a codicil thereto on the ground of undue influence, evidence considered, and held sufficient to support the finding of the jury that undue influence had been exercised by the principal devisees and legatees who were the sons of the testatrix, the managers of her business affairs and her confidential advisers.

**2.—Requested Instruction—Refusal—Practice.**

When a requested instruction to the jury is proper in part and improper in part, the trial court is not required to separate the proper from the improper portions, and the refusal of the whole is not error.

**3.—Testimony—Objection—Practice.**

Where the answer of the witness is in part, at least, unobjectionable, an objection to the whole answer, is properly overruled.

**4.—Will—Undue Influence—Subsequent Statements of Testator.**

While statements of a testator made after the execution of his will are not admissible in evidence to prove the actual fact of fraud or undue influence, such statements are admissible to establish the influence and effect of external facts upon the mind of the testator in making the disposition he did of his property.

Appeal from the District Court of Ellis County. Tried below before Hon. J. E. Dillard.

*Templeton & Harding* and *Finley, Knight & Harris,* for appellant.—There was no evidence adduced before the jury tending to show that Robert L. Goodloe and E. H. Goodloe, or either of them, exercised any undue influence upon their mother, Mrs. M. E. Goodloe, deceased, causing or inducing her to execute the will of date March 5, 1901, or the codicil thereto which is sought to be probated; and

the finding of the jury that the will was executed under such undue influence should have been set aside and a new trial granted. Small v. Small, 16 Am. Dec., 253; Thompson v. Ish, 17 Am. St., 552; Dean v. Negley, 80 Am. Dec., 620; In re Hess' Will, 31 Am. St. Rep., 676; Millican v. Millican, 24 Texas, 443; Brown v. Mitchell, 75 Texas, 9; Barry v. Graciette, 71 S. W. Rep., 311; Turnure v. Turnure, 35 N. J. Eq., 437; Hodges Est., 2 Brewst., 450; McMahon v. Ryan, 20 Pa. St., 329; Eckert v. Flowery, 43 Pa. St., 46; Seguine .v. Seguine, 3 Keys, 663; Rutherford v. Morris, 77 Ill., 397; 1 Redfield on Wills, p. 525, note 32; Englert v. Englert, 98 Pa. St., 326 (47 Atl. Rep., 940); In re Shell's Est. (Pa.), 89 Am. St. Rep., 187; In re Logan's Est., 45 Atl. Rep., 729; Delgado v. Gonzales, 28 S. W. Rep., 459; Robinson v. Stewart, 73 Texas, 271; Gay v. Gillilan, 1 Am. St. Rep., 712; Campbell v. Barrera, 32 S. W. Rep., 725; 2 Wharton on Ev., sec. 1010; Schouler on Wills, 'sec. 243; Page on Wills, pp. 500-1; Morrison v. Thoman, 99 Texas, 248; Patterson v. Lamb, 21 Texas Civ. App., 512; McIntosh v. Moore, 53 S. W. Rep., 611; Page on Wills, secs. 130, 307, 311; Aylward v. Briggs, 47 S. W. Rep., 510; Waddington v. Buzby, 14 Am. St. Rep., 706; Kofka v. Rosicky, 43 Am. St. Rep., 689; Soberanes v. Soberanes, 31 Pac. Rep., 910; Abbott's Trial Ev., secs. 40, 70; 27 Am. & Eng. Enc. of Law, 505; Cliett v. Cliett, 1 Texas U. C., 407; 6 Am. & Eng. Enc., 17, 195.

The influence of a son upon his mother resulting from the relationship and from the dutiful and kindly treatment of the mother by the son can never become undue influence, unless exercised under circumstances or in a manner amounting to moral force and coercion, destroying free agency. Robinson v. Stewart, 73 Texas, 271; Aylward v. Briggs, 47 S. W. Rep., 510; Barry v. Graciette, 71 S. W. Rep., 311; Millican v. Millican, 24 Texas, 427.

The declarations of the testatrix, as testified to by witnesses G. C. Yell and Mrs. Emma Yell, were made at a time remote from the execution of the will and after its execution, and were not competent to prove either want of mental capacity on the part of the testatrix to make the will, or undue influence inducing the making of the will, and were incompetent to show that fraud had been practiced upon the testatrix in the execution of the will, and the objections to the testimony should have been sustained and the evidence excluded. Page on Wills, pp. 500-1; Soberanes v. Soberanes (Cal.), 31 Pac. Rep., 910.

*G. C. Groce, Frost & Neblett, J. C. Muse,* for appellees.—Undue influence is that which compels the testator to do that which is against his will from fear, the desire of peace, or some feeling which he is unable to resist. Morrison v. Thoman, 99 Texas, 248.

Undue influence is moral coercion. In re Carroll's will, 7 N. W. Rep., 434 (Wis.).

Taking advantage of position, or good opinion of a party confiding in another, to disadvantage of such person or his estate. O'Neal v. O'Neal, 14 N. W. Rep., 59 (Minn.); Hanna v. Wilcox, 5 N. W. Rep., 717 (Iowa); Watkins v. Brant, 1 N. W. Rep., 82 (Wis.).

Any influence which induces a person to reach a wrong conclusion. Webber v. Sullivan, 12 N. W. Rep., 319.

The grounds for imputing undue influence must be looked for in the conduct of the parties and in the will rather than in the oral evidence. Marsh v. Tyrell, 2 Hag., 133.

If the testator, by occasion of some present fear of violence, or threatening of future evils, does at the same time or afterwards by the same motive, make a will, it is void. Davis v. Calvert, 25 Am. Dec., 293.

Undue influence, "like the question of insanity, is to some degree open and vague, and must be decided by the application of sound principles and good sense to the facts of each case." Lynch v. Clements, 24 N. J. Eq., 431; Rollwagen v. Rollwagen, 63 N. Y., 504.

"The testator should enjoy full liberty and freedom in making the will, and possess the power to withstand all contradiction and control." Davis v. Calvert, 25 Am. Dec., 292.

Undue influence is rarely susceptible of proof by direct and positive evidence. The very nature of the fact and the cause for its existence suggests secrecy; consequently, as a rule of necessity, it is declared that it need not be shown by direct proof, but may be established by proof of facts from which it may be rationally inferred. Meier v. Buchter, 6 L. R. A., 211 (N. S.), (Mo.); Davis v. Calvert, 25 Am. Dec., 294, 291; Campbell v. Barrera, 32 S. W. Rep., 724.

"Undue influence is not exercised openly. Like crime, it seeks secrecy in which to accomplish its poisonous work. It is largely a matter of inference from facts and circumstances surrounding the testator, his character and mental condition as shown by the evidence, and the opportunity possessed by the beneficiary to exercise such control." Rivard v. Rivard, 63 Am. St., 570.

"Undue influence may be exercised secretly as well as openly, and this is especially possible where a confidential relation exists between the principal devisee and the testator, and they dwell together in the same house." Re Miller, 39 L. R. A., 229; Herster v. Herster, 116 Pa., 612.

Such influence may be exerted in many ways; by violence, by force, by threats, by deceit, or fraud; by excessive importunity; or, by the silent resistless power which the strong often exercise over the weak or infirm. In re Tyner's Case, 106 N. W. Rep., 898.

That a will is written or procured to be written by the principal legatee, and the bequest is unnatural, form strong suspicion against its validity. Renn v. Samos, 33 Texas, 760.

"That it is always a ground for suspicion where one holding confidential relations to a testator prepares and directs the execution of a will under which he takes a considerable interest. This is sound law." Yardley v. Cuthbertson, 56 Am. Rep., 226.

Procuring the will to be written, or the preparation of the instrument by the principal beneficiary is—a "significant and controlling feature of the case." Tyler v. Gardner, 35 N. Y., 559; Harvey v. Sullens, 2 Am. Rep., 491.

Under the Roman civil law, where the principal legatee prepares

the will, and is active in securing its execution, this alone was sufficient to avoid the will.   Hughes v. Meredith, 71 Am. Dec., 128.

The mere facts of relationship and opportunity do not establish undue influence, but taken in connection with sufficient other circumstances, the facts may make out a prima facie case of undue influence.   In re Casey's Will, 92 Minn., 60 (99 N. W. Rep., 363); Gay v. Gillilan, 92 Mo., 250 (1 Am. St., 712); Simpler v. Lord, 28 Ga., 52; Disch v. Timm, 101 Wis., 179 (77 N. W. Rep., 200); Samson v. Samson, 67 Iowa, 253 (25 N. W. Rep., 233); Dale v. Dale, 38 N. J. Eq., 274; notes—Richmond's Appeal, 21 Am. St., 94.

The fact that the preferred son was the confidential agent of the mother is one of the specific circumstances upon which stress is laid by the courts.   Miller v. Miller, 187 Pa., 572 (41 Atl. Rep., 277); Newhouse v. Goodwin, 17 Barb., 236.

In the case here it is shown that Elihu was the confidential advisor in respect to all of her business affairs, and she depended upon him and was subject to his control in respect to her business affairs.   Edgerly v. Edgerly, 62 Atl. Rep., 716 (N. H.); Marx v. McGlynn, 88 N. Y., 370.

We concede the weight of authority to be that an unequal distribution of his estate by the testator to those who are next of kin in the same degree, standing alone, is not legal evidence tending to show that his will was the result of undue influence, exercised by the preferred legatee, or by anyone else for his advantage; but when there is other evidence tending to show undue influence, then the fact that he had not disposed of his property equally between those naturally entitled to his bounty, becomes a fact to be considered in connection with such other evidence.   Knox v. Knox, 36 Am. St. Rep., 235; Schneider v. Manning, 12 N. E. Rep., 270; Lamb v. Lamb, 105 Ind., 457 (5 N. E. Rep., 171); Denison's Appeal, 29 Conn., 405; Bitner v. Bitner, 65 Pa. St., 362; Kevil v. Kevil, 2 Bush, 614; Kimball v. Cuddy, 117 Ill., 217 (7 N. E. Rep., 589); In re Blair's Will, 16 N. Y. Supp., 874; Walls v. Walls, 99 S. W. Rep., 969; Manatt v. Scott, 68 Am. St. Rep., 303.

Unnatural disposition of the property may be considered in connection with other facts going to show undue influence.   Meier v. Buchter, 6 L. R. A. (N. S.), 202 (197 Mo., 68); Re Ruffino, 116 Cal., 304 (48 Pac. Rep., 107); Nicewander v. Nicewander, 151 Ill., 156 (37 N. E. Rep., 698); Sim v. Russell, 90 Iowa, 656 (57 N. W. Rep., 601); Manatt v. Scott, 106 Iowa, 203 (68 Am. St. Rep., 293); Davis v. Calvert, 25 Am. Dec., 282; McGinnis v. Kempsey, 27 Mich., 363; Rivard v. Rivard, 63 Am. St. Rep., 566 (Mich.).

Undue influence which may invalidate a will need not be resorted to, or presently exerted by the beneficiary at the very time of the execution of the instrument; "but it is sufficient if the will was afterwards executed under a controlling influence previously put in operation, and which was still controlling the testator to the extent of destroying his free agency."   Overall v. Bland, 11 Ky. L. Rep., 371; Walls v. Walls, 99 S. W. Rep., 969.

The fact that the principal beneficiary was absent when the will was signed by the testatrix, and at the very moment of its execu-

tion did nothing from which undue influence over the act of the testatrix could be inferred, is of little consequence in this case, in the view expressed by the court in Taylor v. Wilburn, 64 Am. Dec., 188. Re Miller, 39 L. R. A., 230.

These conditions of the testatrix are proper to be considered by the jury, though advanced age alone would not be sufficient ground for the presumption of undue influence. Butler v. Benson, 1 Barb., 538; Sands v. Sands, 112 Ill., 232.

The definition of undue influence presented in special charge No. 8, having already been presented in the general charge, being coupled with the further proposition of relationship, kind treatment, argument, advice, persuasion, etc., proper for consideration of jury, the court was not called on to separate the two propositions, and properly refused the charge embracing both, and in addition would have been a charge on the weight of the evidence. Rosenthall v. Middlebrooks, 63 Texas, 333; Burnham v. Logan, 88 Texas, 1; Ratcliff v. Baird, 14 Texas, 47; De Forest v. Miller, 42 Texas, 36; Missouri P. Ry. Co. v. Cullers, 81 Texas, 394; Missouri P. Ry. Co. v. King, 2 Texas Civ. App., 126.

BOOKHOUT, ASSOCIATE JUSTICE.—The statement of the nature and result of the suit is stated in the appellant's brief as follows:

This cause involves the contest of a will and codicil thereto, arising upon application to probate. In August, 1902, the appellant filed in the County Court of Ellis County his application for the probate of the will and codicil thereto of Mrs. M. E. Goodloe, deceased, his mother, who died on July 25, 1902, leaving a will which designated appellant as the executor. The probate of the will and codicil was contested by J. H. Goodloe, another son, and Mrs. Nannie Wilson, Mrs. Emma F. Mahan and Mrs. Ellen Ross, daughters of the testatrix, each of them being joined by her husband. Said son and daughters filed their contest of the probate of the will and codicil and prosecuted the same in the County Court. The grounds upon which the probate of the will and codicil were contested are:

1. That the testatrix was of unsound mind at the time of the execution of the will and codicil.

2. That the execution of the will and codicil was the result of undue influence.

3. That the execution of the will and codicil was procured through fraud.

The will and codicil were probated in the County Court, and from the decree probating the same contestants, appellees herein, appealed to the District Court. The case was tried in the District Court in October, 1905, resulting in a judgment in favor of contestants denying the probate of both the will and codicil, and from the judgment of the District Court this appeal is prosecuted.

On the trial in the District Court the cause was submitted to the jury on special issues of fact, and the jury returned its verdict consisting of findings in answer to each issue submitted. Appellant

filed a motion to set aside the findings of the jury, which was over-ruled by the court and judgment entered on the findings for ap-pellees. Appellant then filed a motion for a new trial, which was considered and overruled by the court, and thereupon appellant ap-pealed to this court.

The will and codicil sought to be probated were executed re-spectively in March, 1901, and January, 1902, Mrs. M. E. Goodloe, at the time of her decease, and for many years prior thereto, was a widow, and left surviving her two sons and three daughters, to wit, the appellant and the four contestants, all of whom were of age. Another son, R. L. Goodloe, died a short time before the date of the execution of the codicil to the will. It is charged by contestants that undue influence and fraud were exercised and practiced upon the testatrix by the deceased son, R. L. Goodloe, and appellant, E. H. Goodloe, in procuring the making of the will.

The sole ground upon which the probate of the will was denied was that of undue influence found to have been exercised by Robert L. and Elihu H. Goodloe upon the testatrix, their mother, in the execution of the will, and by E. H. Goodloe in the execution of the codicil. The findings of the jury were that the testatrix was of sound mind and that she fully understood the contents of the will and the codicil thereto at the time they were respectively executed by her.

The issue of fraud made by the pleadings was not submitted to the jury, except as it was a part of and involved in the issue of undue influence. The issue of undue influence was submitted, and it is the contention and was the contention of appellees that this undue influence was in itself fraud.

The estate of Mrs. Goodloe in 1902 consisted of 500 acres of land valued at $50 to $60 per acre and about twelve cows. She also inherited about 100 acres of land from R. L. Goodloe and other property, the value of which is not shown.

It is contended that there was no evidence adduced before the jury tending to show that Robert L. Goodloe and E. H. Goodloe, or either of them, exercised any undue influence upon their mother, Mrs. M. E. Goodloe, deceased, causing or inducing her to execute the will of date March 5, 1901, which is sought to be probated, and the finding of the jury that the will was executed under such undue influence should have been set aside and a new trial granted.

The will sought to be probated was executed March 5, 1901, by Mrs. M. E. Goodloe, and was witnessed by Harry Oglesby and G. M. Goins. After directing the payment of all just debts the will devised all the estate, real, personal and mixed, to the two sons, R. L. and E. H. Goodloe, share and share alike, imposing, however, upon them the trust and condition that they should pay in cash to each of the daughters, Ella Ross, Nannie Wilson and Emma Mahan, the sum of $500, and providing that if either of the daughters should die prior to the death of the testatrix the said sum of $500 should be paid to the heirs of such deceased daughter. The will recited that advancements had been made from time to time to the son, J. H. Goodloe, and that no further provision would be made

for him. The will also provides that the two sons, R. L. and E. H. Goodloe should act as executors of the will and that no bond should be required of them, and that in case either of them failed or refused to act or should be deceased, then the other should be sole executor, etc.

The codicil is appended to said will, and while it is not dated, the evidence shows that it was executed January, 1902. It is signed by M. E. Goodloe and witnessed by J. W. Haskins and R. Hooks, and is in these words: "Whereas, R. L. Goodloe has departed this life since this will was made, I, Margaret E. Goodloe, now make this codicil to said will, and will and devise all my estate of whatsoever character to my son, E. H. Goodloe, and provide that he shall pay to my three daughters, names, Ella Ross, Nannie Wilson and Emma Mahan, each one thousand dollars, instead of five hundred dollars each, as therein stated, and my son, J. H. Goodloe, five hundred dollars. In other respects my said will shall remain as it is."

In 1891 Mrs. Goodloe executed a will which appellant claims was lost, and it was shown to have been substantially the same as the will executed in March, 1901. She was seventy-two years of age at the time of her death. Robert L. Goodloe was the oldest son. He died on January 9, 1902, and had been married only a few weeks at the time of his death. At the time of her death, and for a number of years previous thereto, Mrs. Goodloe lived upon the home place, and her son, E. H. Goodloe, and his wife and children lived on the place with her and managed the farm and affairs about the place. Robert was the recognized head and director of the family affairs and business up to the time of his death, though he resided in Waxahachie. He paid weekly visits to the home and consulted and advised with his mother and brother in charge of the home place.

It is, in effect, conceded by the appellees that the several facts adduced upon the trial to support the issue of undue influence, each taken and considered by itself alone, without the supporting evidence, would not be sufficient to support the finding of the jury. They, however, strenuously insist that the evidence before the jury, considered as a whole, would not have authorized any other conclusion than that expressed by the verdict. The term "undue influence" is not difficult of comprehension, but is of definition. The definitions given by the courts are varied to meet the phase of case then under consideration. The definitions are not so clear, to the untrained mind especially, as the term itself.

Following are examples of definitions given by courts of last resort: Undue influence is that which compels the testator to do that which is against his will from fear, the desire of peace, or some feeling which he is unable to resist. Morrison v. Thoman, 99 Texas, 248.

Undue influence may be exercised secretly as well as openly, and this is especially possible where a confidential relation exists between the principal devisee and the testator, and they dwell in the same house together. *Re* Miller, 39 L. R. A., 229. Herster v. Herster, 116 Pa., 612.

Such influence may be exerted in many ways: by violence, by force, threats, by deceit, or fraud; by excessive importunity; or, by the silent resistless power which the strong often exercise over the weak· or infirm. *In re* Tyner's case, 106 N. W. Rep., 898.

The will of 1901 was drafted by J. A. Beall, an attorney at Waxahachie, at the request · of R. L. Goodloe, who furnished the data upon which it was prepared. Beall, at the time, had been acquainted with R. L. Goodloe for about ten years quite intimately. He was not personally acquainted with Mrs. M. E. Goodloe, and had no personal communication with her of or concerning the drafting of the will. Sometime during the, month of January, 1901, this will was signed by Mrs. M. E. Goodloe under circumstances as follows: E. H. Goodloe called Harry Oglesby and G. M. Goins, ·two farm hands in his employ, into his mother's room to witness his mother's signature to the will. Mrs. Goodloe was sitting by the side of a table with the will on the table. E. H. Goodloe requested her to sign the will. She took the pencil and made an attempt to sign her name, and after some hesitation started to sign, but seemed to fail in writing the letter "G" in her name. E. H. Goodloe then took the pencil and rubbed out the letter "G" as made by her and made the "G" himself and gave the pencil back to his mother, and she wrote the balance of her name. During the time nothing was said by Mrs. Goodloe. She did not request the witnesses to sign the will. E. H. Goodloe was living at the time with his mother. The will was left in her possession and afterwards found by E. H. Goodloe in his mother's drawer, and he took it to the store and put it in the safe. It remained there until the codicil was written on it. The appellant testified that this will was made to take the place of a will made by his mother in 1891, and which had been lost. There is testimony that in 1891 Mrs. Goodloe executed a will similar to the one of 1901. The draft of a will ·was prepared by Judge Templeton, of Waxahachie, in 1891, at the request of R. L. Goodloe, with whom he was intimately acquainted. This draft was found among the papers of Robert L. Goodloe after his death, endorsed "will of Mrs. M. E. Goodloe." It was not signed. Judge Templeton did not know Mrs. Goodloe, and had no communication with her as to the terms of the will. The witness, J. M. Pitts, testifies to signing as a witness a will in 1891, by which the real estate of Mrs. Goodloe was to go to R. L. and E. H. Goodloe; that the girls were to get $500 apiece, and he does not know whether J. H. Goodloe was named in it or not. He says this will was typewritten, but the blanks were filled in with pen and ink. That the witness and his brother signed the same as witnesses at the request of E. H. Goodloe in the room of Mrs. M. E. Goodloe, she at the time was sitting in her room by the side of the table with the will upon it, nothing being said by her to either of the witnesses at the time. This will was left in the possession of Mrs. Goodloe after being signed and witnessed. These witnesses were at the time tenants of E. H. Goodloe and boarding with the Goodloe family. The will of 1891 was last seen in the possession of Mrs. Goodloe, and we

think it more natural to infer that instead of being lost, as claimed by appellant, it was revoked and destroyed by her.

The evidence shows that R. L. and E. H. Goodloe each had great influence over their mother and she could be easily influenced by either of them; that they lived at home on the farm with her until R. L. Goodloe moved to Waxahachie, and after this he frequently visited the place and advised with E. H. Goodloe in reference to the conduct of the farm. The relations between them and their mother were confidential and she relied implicitly upon their advice and judgment. Sometime in the fall of 1901 R. L. Goodloe married and about six weeks thereafter he was taken sick and died. His sickness and death had great influence on his mother, Mrs. M. E. Goodloe. She was taken sick, confined to her bed and for many weeks it was thought she would not recover. R. L. Goodloe died on January 9, 1902, after which Mrs. Goodloe made a codicil to her will. As to how she came to make this codicil E. H. Goodloe testified: "After Bob's death I was in Waxahachie several times trying to arrange our business. He and I were partners in all business affairs. In trying to reach a settlement with his widow, as well as other matters, the question of a prospective heir was considered. After making two or three trips backwards and forwards, my mother asked me how I was getting along with the business in regard to mine and my brother's estate, fixing it up. I said I was getting along very well, but did not know when we could do anything, as it was rumored that there was a prospective heir. She remarked that Sadie, meaning Bob's widow, had talked to her about that, and she did not think there was anything in it, but if there was anything of that sort that she wanted to change her will. I told her that I did not know how she would go about doing it, but would ask a lawyer next time I went to town, so the next time I did go to town I asked Judge Templeton in regard to it, and he said it could either be done by a codicil or making a new will, and asked me if I knew how mother wanted the property to go. I told him that I did not, that we had not gone into the details, and he told me I had better find out. I went home and asked mother, and she said that she wanted her property to go like it was in the will, except that she wanted to give me the real estate and personal property and the girls $500. I replied, 'Ma, give them more than that if you can. I think it is due them, and I think it would give better satisfaction in the family relations. You can either give them real estate, or pay them more money. If you don't want to change it give them more money, at least make it a thousand dollars more than what it is.' She replied, no, she did not know that she wanted to make it any more, but said if it was my desire it was all right. I told her that she would get something out of Bob's estate, but did not know how much."

Judge Templeton, after conferring with E. H. Goodloe, and at his request, wrote the memoranda for the codicil to Mrs. Goodloe's will. This memoranda was taken by E. H. Goodloe to Red Oak, where he had his clerk and book-keeper, C. E. Whigham, to copy the same on Mrs. Goodloe's will. After it was copied E. H. Goodloe asked to

see the will and codicil, and after having it read to him, he stated that nothing was said as to J. H. Goodloe. He induced Whigham to interline therein the words, "and my son, J. H. Goodloe, five hundred dollars." This was not on the memorandum prepared by Judge Templeton. He told Whigham that Mr. Hooks and Mr. Haskins would take it down to the house and get it signed. Thereafter and on the 23d of January, E. H. Goodloe made a trip to West Texas. While he was gone Mrs. E. H. Goodloe telephoned to R. Hooks, a member of the firm of Hooks & Company, to come up and bring Mr. Haskins and the papers, meaning the will and codicil. This was early in the morning. Hooks had a horse hitched to a buggy and drove and got Mr. Haskins and returned to the store and got the will and codicil from the book-keeper and drove to Mrs. M. E. Goodloe's residence, reaching there about 8 o'clock in the morning. After hitching the horse they entered the house and were taken by Mrs. E. H. Goodloe to the room of Mrs. M. E. Goodloe. She was dressed and lying on the bed. She got up and took a chair. The codicil was produced and read to her by Mr. Haskins. She signed it and Hooks and Haskins signed it as witnesses and returned the will and codicil to the book-keeper at the store. On the evening of the same day E. H. Goodloe called from Ft. Worth over the telephone for Hooks at Red Oak. Hooks answered, and among other things, informed him his mother had signed the codicil. Goodloe returned to Red Oak the next day.

Mrs. Nannie Wilson, one of the daughters of Mrs. M. E. Goodloe, testified as to a conversation she had with E. H. Goodloe in her mother's room in reference to the will and codicil. She says: "I was talking to her (Mrs. M. E. Goodloe) when Eli came in the room. I said to him, set down and lets talk altogether, and I repeated some verses in the Bible, and he replied, Nannie, you need not come here quoting scripture; I won't have it, and said you and Emma are coming here worrying Ma about this will, and that you and Emma are scared; you are not hurt, and I replied, while this will is like it is, we are in a fair way to be hurt, and he said, you are not; I am going to treat you right, and I have said all the time I would. I will give you an equal division and will pay you back rents if I have got the money, and if I have not got the money I will give you the land. I said, Eli. He said, I will treat you right, and I said, that is all any of us want you to do, that is to treat us right. After Ma's death I had another conversation with Eli, in which I told him that he had promised to have Ma change the will, and he replied that he had spoken to his mother about it and told her there was going to be dissatisfaction and that she had better change it, and he said that Ma replied for the children just to take it and fix it to suit themselves, and further said that his lawyer had him to get the codicil in order to keep Sadie from getting in and getting Ma's property."

There was evidence by other witnesses to the effect that E. H. Goodloe stated after his mother's death, in speaking of the codicil, that there was the prospect of an heir to the widow of his brother, Robert, and that the codicil was made to cut out this heir. G. C.

Yell testified to having lived, near Mrs. M. E. Goodloe and having frequently visited her. He says: "During the year 1902 I visited her at her home. She discussed with me about her will, and said that she signed the paper or will; that E. H. Goodloe promised her that if she would sign this paper, or will, that he would divide equally the property with the girls, but that if she did not sign this will that Bob's wife, meaning R. L. Goodloe's wife, would come in and get all the property. Mrs. M.· E. Goodloe was talking to me about a matter which occurred in her young days. She brought up the subject of her will, but went on to state that she wanted her girls to have their part of her estate, and Eli had promised her that if she would sign the paper, or will, that he would divide the property equally with the girls, but if she did not, Bob's wife would come in and get all the property." Mrs. Yell testified substantially the same as her husband, G. C. Yell.

Thus, it is seen that the will of 1901 was procured by R. L. Goodloe without consulting his mother, so far as the evidence shows, and signed by the testatrix at the request of E. H. Goodloe, who procured as witnesses thereto two of his employes. The testatrix was at the time an old lady and in feeble health. She could be easily influenced by these sons, or either of them. The relations between R. L. and E. H. Goodloe and their mother were confidential in that they were in charge of her property and she permitted them to control and manage it according to their own wishes. She relied solely in this matter on the judgment of these sons. They were the principal beneficiaries in the will and received the great bulk of her property. The estate consisted largely of land which the will bequeathed to these sons. The girls, of whom their mother had always spoken kindly and who had always been kind and affectionate to her, were given a mere pittance—$500 apiece—and J. H. Goodloe was not mentioned at all. The distribution made by the will was not only unequal among the children, but we believe we are justified under the facts in saying unnatural. The facts of the will being procured to be prepared and caused to be executed by the principal beneficiaries therein, raise a suspicion which ought to appeal to the vigilance of the court to examine with caution into all the circumstances which were attendant upon its execution. Underhill on the Law of Wills, 195. The circumstances, the procuring of the will to be drawn, and the supervising of its execution by the principal beneficiaries, would, in the language of Mr. Underhill, "have great importance and weight where the testator was very old and decrepit, or where the party interested in procuring the will, had, for a long period, occupied confidential relations toward him. Thus, if the testator is old and feeble, unable to devote his attention to the active management of his estate, and for some time prior to the execution of the will permitted the legatee to exercise an exclusive and complete control of all his property, the drawing of a will in his own favor by the confidential agent would be a circumstance of the gravest suspicion. The presumption of fraud and of undue influence would, in such case be almost irresistable." 1 Underhill on Law of Wills, 197.

Considering the fact that the will of 1901 was caused to be prepared by R. L. Goodloe without consultation, so far as the record shows, with Mrs. M. E. Goodloe, and caused to be executed by E. H. Goodloe in the manner shown, the confidential relations between the testatrix and the preferred beneficiaries, and their great influence over her, the unequal distribution of her property, her age and feeble condition of body and all the facts in the case, we can not say that the verdict of the jury is without evidence to support it. The question of undue influence was one of fact to be determined by the jury from the evidence. There were facts and circumstances shown upon the trial which justified them in returning the verdict as found by them. Appellant's first assignment of error is therefore overruled.

These remarks also apply to the appellant's second assignment of error which complains of the finding of the jury upon the issue of undue influence, as applied to the codicil sought to be probated. At the time of the execution of this codicil Mrs. Goodloe was in very feeble health, and it was thought she would not recover from the shock produced by the death of her son Robert. Her physician, Dr. Mahan, testified that immediately after Robert's death and for three weeks Mrs. Goodloe was under the influence of opiates. There was some evidence tending to show that her purpose in executing it was to cut out the supposed posthumous heir of the widow of her son Robert; that notwithstanding the codicil her son, E. H. Goodloe, would share the property equally with his sisters. This he had said he would do while talking to his sister, Mrs. Wilson, in his mother's room and presence. But it is argued that E. H. Goodloe was absent in West Texas at the time his mother executed the codicil, and he could not have exercised any undue influence over her. Before he left for the West he made all arrangements for the execution of the codicil by his mother. He had procured it to be written and endorsed on the will. After his book-keeper endorsed the draft of the codicil prepared by Judge Templeton upon the will, Goodloe, after having the codicil read to him, caused the clerk to interline therein a clause giving his brother, J. H. Goodloe, $500. He had arranged for the witnesses, before going West, one of whom was his business partner. After he had gone his wife called up over the telephone to Hooks "to come up and bring Mr. Haskins and the papers." Hooks understood that she meant the will and codicil. After being away three or four days he called from Ft. Worth over the telephone for Hooks at Red Oak, and was told by Hooks that the codicil had been signed. The next day he returned home. All these circumstances show that E. H. Goodloe had made full arrangements for the signing of the codicil before going West, and there is nothing to show that Mrs. M. E. Goodloe was cognizant of any of these facts. In this condition of the evidence we think the following excerpt from the opinion in the case of Taylor v. Wilburn, 20 Mo., 306; 64 Am. Dec., 186, applicable: "Such is the nature of the human mind that when it has been habituated to the influence of another it will yield to that influence, and suffer it to have

its effect, although the person in the habit of its exercise may not be present or exert it at the time an act is done. So that the inquiry, in such case, is not whether an undue influence was exerted at the time of the execution of the will, but whether an influence had been acquired, and did operate in the disposition of his property by the testator." We conclude that no error is pointed out by the second assignment of error and the same is overruled.

There was no error in refusing the special charge requested by appellant instructing a verdict for appellant.

The fourth assignment complains of the court's action in refusing special instruction No. 8, asked by appellant, as follows: "You are instructed that undue influence, as used in the issues on that subject, means such influence as overcomes the willpower and destroys the freedom of the testator, so that he is unable to resist and results in the making of a will, which is contrary to the testator's wishes. The influence of a son upon his mother resulting from the relationship and from dutiful and kindly treatment of the mother by the son, or influence exerted by means of argument, advice, persuasion, solicitation, or suggestion, can never become undue influence unless exercised under circumstances or in a manner amounting to moral force and coercion, destroying free agency." The definition of undue influence set out in this special charge was fully covered by the court's general charge, and it would not have been proper to have repeated it. The proposition of relationship, kind treatment, argument, advice, persuasion, coupled as it was with the definition of undue influence, which should not have been repeated, it was not incumbent on the court to separate the two propositions, and the judge was, therefore, justified in refusing the entire charge.

While E. H. Goodloe, appellant, was on the stand and being cross-examined by appellees' counsel, the following occurred: Counsel for appellees, to the witness: "I wish you would write your name on this piece of paper." The witness writes his name, "E. H. Goodloe," on the paper. Contestants offered in evidence the signature of E. H. Goodloe. Proponent's counsel objected. The objection was overruled and the ruling is preserved in the record and made the basis of the fifth assignment of error. If it be conceded that this action of the court was error, it was harmless and furnishes no ground for reversing the judgment.

The sixth, seventh and eighth assignments are grouped and presented together. They complain of the court's action in overruling certain objections to the sixth direct interrogatory propounded to each of the witnesses, G. C. Yell and Mrs. Emma Yell, and in permitting the answers thereto to be read in evidence; and also in overruling proponent's objection to the seventh direct interrogatory propounded to Mrs. Emma Yell, and in permitting the answer to be read in evidence to the jury. It is contended that the testimony objected to was the mere conclusions of the witnesses. There was no error in overruling the objections. Each of the answers contained matter which was admissible and the objections failed to

separate the admissible matter from that which was objectionable. St. Louis S. W. Ry. v. Frazier, 87 S. W. Rep., 400.

The ninth and tenth assignments of error are grouped. These assignments are based on the action of the court in overruling the proponent's objections to the answers of G. C. Yell and Mrs. Emma Yell as to statements made to them by the testatrix, Mrs. M. E. Goodloe, in 1902, and after the execution of the codicil, in which she stated in substance that she wanted her girls to have their part of the estate and that Eli had promised her, if she would sign a paper, or will, he would divide the property equally with the girls, and if she did not, that Bob's wife would come in and get all the property. It is contended that these declarations were made at a time remote from the execution of the will and after its execution, and were not competent to prove either want of mental capacity on the part of the testatrix to make the will, or undue influence inducing the making of the will, and were incompetent to show that fraud had been practiced upon the testatrix in the execution of the will, and the objections to the testimony should have been sustained and the evidence excluded. In reference to this testimony the court instructed the jury as follows: "In lieu of a special instruction requested by proponent, you are instructed that the testimony of G. C. Yell and Emma Yell as to the statements made to them by Mrs. M. E. Goodloe, are not to be considered of themselves as evidence of fraud or undue influence, but they are admitted and are to be considered only in connection with other facts, if any are shown, to show the influence and effect of such other facts, if any, upon the mind of the said Mrs. M. E. Goodloe when she executed the document spoken of as a codicil." As to the admissibility of statements by the testator made after the execution of the will tending to show his reasons for disposing of his property in a given manner, the authorities conflict. Page on Wills, pp. 500-501. Such declarations are held admissible in Pennsylvania. Herster v. Herster, 116 Pa., 612. They were held admissible by the court for the Fourth District in Campbell v. Barrera, 32 S. W. Rep., 724. The court in its opinion in that case says: "As primary proof that the testatrix was influenced in making the will by fraud or compulsion these declarations were inadmissible. . . . But while they were not admissible to prove the actual fact of fraud or improper influence they were competent to establish the influence and effect of external facts (if any were shown) upon the mind of the testatrix herself." In this case there was evidence and other facts shown tending to show that the will and codicil were the result of undue influence brought to bear on the testatrix, Mrs. Goodloe, and the testimony was admissible to show the effect of the same upon her mind and feelings. The trial judge in his charge properly limited the jury in their consideration of the evidence to this purpose. The assignments nine and ten are overruled.

The eleventh and twelfth assignments complain of the action of the trial court in overruling objections to certain remarks made by appellees' counsel while addressing the jury. We have carefully

examined these assignments and because in our opinion no reversible error is pointed out therein the same are overruled.

Finding no reversible error in the record the judgment is affirmed.

*Affirmed.*

Writ of ·error refused.