**STOLLE et al. v. KANETZKY.** (No. 6696.)*

(Court of Civil Appeals of Texas. Austin. Jan. 16, 1924. Rehearing Denied Feb. 20, 1924.)

1. **Trial ⬥351(2)—Submission of issue waived by failure to request it.** '

By failure to request submission of an' issue in a case submitted on special issues, appellee waived such submission.

2. **Wills ⬥50—Essentials of testamentary capacity stated.**

To execute a valid will, testator must have sufficient mental capacity to understand the nature of his act, the nature and scope of his estate, and the natural objects of his bounty.

3. **Wills ⬥55(10)—Evidence held to show testator's intent to provide for natural objects of bounty.**

In a suit to annul a will for mental incapacity, evidence held to show that testator knew what he was doing and undertook to provide for his children alike, except the principal beneficiary, whom he undertook to reward for remaining at home and caring for him in his old age.

4. **Wills ⬥55(1)—Testator's insanity or impaired mental capacity held not shown.**

In a suit to annul a will,' evidence that testator occasionally got drunk and drank intoxi-

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction March 26, 1924.
259 S.W.—42

cating liquors, plaintiff's testimony that he was getting old and feeble, and testimony as to acts tending to show his meanness, criminality, uncouthness, disregard of his contract, etc., *held* insufficient to show insanity or impaired mental capacity.

**5. Wills ⚜️400—Evidence considered most favorably to appellee succeeding on issue of undue influence.**

In determining the question of undue influence, on appeal from a judgment annulling a will on such ground, the evidence must be considered in its most favorable aspect for appellee, disregarding conflicts, contradictions, and all adverse evidence.

**6. Wills ⚜️155(1)—Undue influence depends on facts of each case.**

What constitutes undue influence depends on the particular facts of each case, as applied to general principles of law.

**7. Wills ⚜️153, 155(1)—"Undue influence" and "fraud" distinguished.**

"Undue influence" is that which compels testator to do something against his will from fear, desire for peace, or some feeling he is unable to resist, and need not be attended with deception or circumvention, while fraud consists in making something false appear true to testator, thus affecting his will, and need not be attended with undue influence, except in so far as the misrepresentation amounts to influence.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fraud; Undue Influence.]

**8. Wills ⚜️163(8)—Undue influence not presumed or inferred from opportunity or interest.**

Undue influence cannot be presumed or inferred from opportunity or interest, but must be proved to have been exercised in relation to the will itself and not merely in other transactions.

**9. Wills ⚜️155(3)—Mere persuasions or entreaties not undue influence.**

Mere persuasions, entreaties, or mere suspicion of undue influence will not invalidate a will on such ground.

**10. Wills ⚜️166(1)—Evidence of destruction of former will would not show undue influence.**

Evidence that a former will, differing from one sought to be annulled for undue influence, had been destroyed, would not establish undue influence.

**11. Wills ⚜️163(1)—Burden of showing undue influence is on party attacking will.**

To set aside the probate of a will for undue influence, the burden is on plaintiff to show that testator was induced to act contrary to his own wishes and make a different will from one he would have made if left entirely free to act according to his own judgment and discretion, and such influence must have been in effect at the very time of the execution of the will.

**12. Wills ⚜️155(1)—Undue influence cannot be predicated alone on testator's dislike of certain person.**

Undue influence cannot be predicated alone on testator's dislike of the husband of one attacking the will on such ground.

**13. Appeal and error ⚜️1001(1)—Effect of verdicts supported by any legal testimony stated.**

Appellate courts are slow to set aside verdicts supported by any legal testimony.

**14. Wills ⚜️324(3)—Undue influence held not established as matter of law.**

Evidence *held* insufficient, as a matter of law, to establish undue influence.

On Motion for Rehearing.

**15. Appeal and error ⚜️1175(5)—Appellate court finding evidence insufficient to support judgment may reverse and render.**

The appellate court may determine whether the evidence is sufficient, as a matter of law, to support the judgment, and, having determined that it is not, may reverse and render the case.

**16. Appeal and error ⚜️1175(5)—Judgment rendered for appellants where only evidence available is overwhelmingly against verdict and mostly incompetent.**

Where the evidence, though sufficient to take the case to the jury, is so overwhelmingly against the verdict that the appellate court cannot permit it to stand, but it is shown that it was all that could be had, and much of it would be incompetent on another trial, a judgment will be rendered for appellants, though they moved for exclusion of all the evidence and an instructed verdict solely on the ground of its insufficiency to establish the issues submitted; it being futile to remand the case.

**17. Witnesses ⚜️131—Heir suing to annul will held incompetent to testify to acts and conduct of testator on which opinion as to mental capacity and undue influence based.**

Rev. St. 1911, art. 3690, prohibiting testimony as to transactions with or statements by testator applies in a suit by an heir to set aside the probate of his will, so as to exclude testimony of plaintiff relating to the acts, conduct, and statements of testator upon which she based her opinion as to his mental capacity or as to the exercise of undue influence upon him.

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Suit by Frederika Kanetzky to annul and set aside an order probating the will of Christian Stolle, deceased. From a judgment setting aside the order and annulling the will, August Stolle and others appeal. Reversed and rendered.

Harry Barnhart and D. H. Doom, both of Austin, for appellants.

Dickens & Dickens, of Austin, for appellee.

⚜️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

BLAIR, J. This is an appeal from a judgment of the district court of Travis county, setting aside an order of the county court of Travis county, probating the will of Christian Stolle, and annulling it upon the jury's finding that at the time of its execution the testator was of unsound mind, and that August Stolle, the principal beneficiary under the will, had unduly influenced the testator in its execution.

Appellee, Mrs. Frederika Kanetzky, daughter of testator, filed her petition seeking to annul the will and to have the order probating it set aside, upon three grounds: First. Because of the alleged mental incapacity of the testator at the time of the execution of the will to know the nature of the testamentary act, caused by old age and the excessive use of intoxicating liquor. Second. Because of the alleged undue influence exercised over the deceased by August Stolle, the proponent of the will, in securing its execution. Third. Because of the alleged fraud practiced by August Stolle in falsely representing to the testator that Joe Kanetzky, husband of Frederika Kanetzky, appellee herein, and whom the testator was alleged to have disliked, would get the property if it was bequeathed to appellee; and that he (August Stolle) would see to it that his sister would be cared for if the property was bequeathed to him, and that Joe Kanetzky would get none of it.

Appellant filed a general demurrer and a special demurrer to the allegation of fraud, and a general denial. The special demurrer does not seem to have been urged or passed upon by the court.

This is the third appeal of this case. On each of the trials, appellee has obtained a favorable verdict of the jury on both the issue of mental incapacity and undue influence exercised by August Stolle over the testator in the execution of the will. The opinion of the San Antonio Court of Civil Appeals on the first appeal is reported in the cause of Stolle v. Kanetzky, 220 S. W. 557. The opinion of this court, on the second appeal, is reported in the cause of Stolle v. Kanetzky, 238 S. W. 724. On both of the former appeals the cause has been reversed and remanded, because the verdict of the jury was against the overwhelming weight of the testimony. On the instant appeal, the complaint is that the verdict of the jury was not only against the overwhelming weight of the testimony, but that the same is unsupported by any legal testimony.

## Opinion.

[1] Our findings of fact will be set forth in the opinion discussing the issues raised in this case. The issue of fraud was not submitted to the jury, nor did appellee request its submission, and by such failure waived it, since the case was submitted up-on special issues. The effect of any testimony of fraud upon the issue of undue influence will be discussed under that issue.

[2, 3] Appellee's principal attack upon the will on the issue of mental incapacity of the testator to execute it is based upon an alleged unequal distribution of testator's estate as to her, because as a girl she was compelled by her father to work hard to help pay for the property and, coupled with other acts of the testator, showed him to be laboring under such mental deficiency or delusions at the time of the execution of the will as to incapacitate him from apprehending the scope of his estate, and to know the natural objects of his bounty, and to understand the nature of the testamentary act. It is too well established to necessitate citation of authorities that a testator must have sufficient mental capacity to understand the nature of the testamentary act, the nature and scope of his estate, and the natural objects of his bounty to execute a valid will. In view of this attack upon the will, a brief history of the acquisition and payment of the properties which constituted the principal estate of Christian Stolle at the time of his death:

It consisted of about 270 acres of land in Travis county, Tex., which was the community property of himself and his wife. Its value at the time of the execution of the will was not proved. Appellee testified that, at the date of the trial, December, 1922, more than 12 years after the execution of the will, it was worth about $45,000. She also testified that a nice residence had been erected on the premises by August Stolle since the death of the testator, which, of course, enhanced its value. The will in question, of date May 11, 1910, bequeathed testator's entire estate in the community property to his wife during her lifetime, and to August Stolle after her death, charged with the payment of legacies to William and Gustave Stolle, sons of the testator, each in the sum of $4,000, and to Mrs. Frederika Kanetzky, appellee, the sum of $10. The proof also shows that on March 23, 1910, only a few days before the execution of the will in question, the testator conveyed to appellee a life estate in 40 acres of land, and conveyed the fee to the heirs of her body; on which land was situated a five room residence, and that it was of the probable value of $4,000, the amount of the legacies provided by the will for testator's other children, except August Stolle.

The testator and his wife purchased the first 200 acres of land in question, on July 24, 1886, for a total recited consideration of $4,000, $1,000 cash, and the testator executed his two notes for the balance, one note for $2,000, due January 1, 1887, the other note was for $1,000, due three years after date. He paid $500 on the $2,000 note on

January 1, 1887, and an agreement was indorsed on the back thereof, extending the date of the payment of the balance until 1895. Another indorsement on the back of this $2,000 note shows that in 1901 a balance was due thereon of $1,000. The $1,000 note, due three years after date, was marked "paid" and canceled October 28, 1890, and both notes were released in full on March 21, 1902. The second piece of property acquired by testator and his wife was 13¹⁷⁄₂₀ acres of land, in May, 1889, for which they paid $311.62 cash. The third piece of property acquired by them was 60 acres on the 3d day of December, 1894, and the recited total consideration was $2,251, of which amount $295 was paid in cash, and they assumed the payment of six vendor's lien notes then outstanding against the land, each for the sum of $328. All these notes were paid off at various times after the date of the purchase, and were formally released as a lien against the land on the 22d day of November, 1898. The fourth tract of land was 40 acres, purchased from Joe Kanetzky and his wife, Frederika Kanetzky, appellee herein, on the 20th of December, 1898, for a recited consideration of $1 cash and the assumption of the payment of one note for $920, which note was executed by Joe Kanetzky at the time he purchased the land on December 31, 1890. This note was paid off by testator and formally released to him on March 22, 1910. The record shows that Joseph Kanetzky purchased this 40 acres on December 31, 1890, for the recited consideration of $920, which was paid by the execution of the note above mentioned and assumed by the testator. This 40 acres adjoined testator's home place, and was the same 40 acres which was deeded to the children of Mrs. Kanetzky, appellee, with a life estate in herself, on March 23, 1910, as hereinabove stated; the recited consideration for this conveyance being $1 cash, and the love and affection that testator and his wife bore their daughter.

It is thus shown that all of the property was acquired and paid for after appellee's marriage, except the 200-acre tract, and that at least one-half of the purchase price of the 200-acre tract was paid for after appellee's marriage. The testimony shows that August Stolle remained at home, and that he worked the farm and cared for his parents, never leaving them; that he remained a single man until he was 28 years of age; that he married a few months prior to the execution of the will in question; and that he and his wife, after their marriage, remained on the home place and lived with and cared for the testator and his wife until their death. The testimony further shows that appellee had the use of 10 acres of land, which she says her father gave her as a wedding present, for more than 20 years before he took it away from her. No deed was executed to appellee conveying this 10 acres, but she states that she was permitted to fence it along with the 40 acres purchased by her husband in 1890.

We submit that these facts show that testator not only knew what he was doing, but that he undertook to provide for all his children alike, except August Stolle, and that he undertook to reward August Stolle, who had remained at home while testator was paying off the indebtedness on the land, and to reward August for his care of him in his old age.

[4] As to the testimony on the issue of insanity, caused by an excessive use of intoxicants by testator, it is wholly insufficient as a matter of law. It showed nothing more than that occasionally the testator got drunk —that he occasionally drank whisky, beer and alcohol. Appellee and her husband swore that he drank a whole lot of whisky, beer, and alcohol, and that his mind was affected by drinking, how or in what manner they did not state. No alienist testified on this issue.

On the allegation that on account of old age his mind had become impaired and weak, the proof showed that he was probably 74 or 75 years old at the time of his death, and 69 or 70 at the time of the execution of the will, and that he was strong, healthy, and vigorous about the time of the execution of the will. There is no evidence to the contrary, except appellee and her children state that he was getting old and feeble.

The acts and conduct of the testator upon which the witnesses based their conclusion that the testator was of unsound mind are wholly insufficient as a matter of law to establish insanity. We will not undertake to detail all of these acts, as they are of a similar nature and do not prove insanity. It is true that some of the acts testified to may establish the fact that the deceased was a mean man, or a criminal, or uncouth and coarse, or that he would disregard his contract, or that he did acts in a jocular manner under circumstances that it was not wise to do so, but in no way are they sufficient as a matter of law to establish insanity.

Four witnesses besides appellee and her family testified to certain acts upon which they based their opinions that testator was of unsound mind. One witness states that he knew testator many years and had seen him drunk on several occasions; that for 10 or 12 years prior to 1915 or 1916 he was engaged as a rural mail carrier on a route running by testator's farm; that in the year 1915 or 1916, which was 5 or 6 years after the execution of the will in question, testator met him at the mail box and laughingly ran his hand in the mail pouch to get his

mail, and witness stopped him and told him that was against the law; that testator's mind was like a child's mind; but that he would not say testator was feeble-minded in 1910, at which time he knew him well.

Another witness testified that in 1898 he went to testator's home and purchased two steer calves from him, and, after paying for them, left them to be called for at a later date; that some two or three months later when he called for the calves testator had sold them to some one and refused to return the purchase price; that testator's wife returned him the purchase price because she did not want her husband to get into trouble about the matter. Based upon this transaction, witness thought that testator was of unsound mind in 1898.

Witness Sandy Nixon, a negro, who was employed as a farm laborer and lived on the farm as a subtenant of August Stolle from about 1907 to 1911, after testifying that upon the order of August Stolle he grubbed up some fruit trees and removed a fence, and that on one occasion when his house blew off its blocks he moved into a house on the place rented by Joe Kanetzky from testator, that testator came over and threatened to have the officers come and throw him out if he did not move back, summarized his testimony and conclusion of insanity of testator as follows:

"I think the old man was of unsound mind because August Stolle came and had me to go over and dig up some fruit trees and tear down some fence, and because the old man would not let me live in Mr. Kanetzky's house and wanted me to move back into the other house and would not rent me any land and told me to go to August Stolle. A man with a sound mind would not do that way. That is my opinion."

Julia Nixon, wife of Sandy Nixon, said she thought testator was of unsound mind because he had her husband dig up the fruit trees and remove the fence off the 10 acres of land, and because he would just get out of his buggy when he came in from town and leave his team for her husband or Mr. August Stolle to unhitch when they came in from work, and because testator caught hold of her shoulders one night while she was going with him from her house to testator's house to care for his sick wife—that she just pulled loose from him and went on a little in advance of testator.

One of appellee's daughters testified that she thought her grandfather was of unsound mind because he came in when she was grinding sausage for her grandmother one day and ran his hand up the back of her dress, and that she stuck him with a hat pin; that a few days after this testator sent her to the barn to shuck corn, and that as he came in the door of the barn she jumped out of the window, because she was scared of him, and that all he said was in substance, "You little fool, why are you running; I am not going to hurt you."

Appellee and her witnesses practically based their opinions of insanity of testator upon the incident of grubbing up some fruit trees and removing the fence from 10 acres of land which she says her father gave her as a wedding present. This incident occurred in January, 1910, a few months preceding the execution of the will. She does not contend that this land was ever deeded to her. This transaction is not fully explained, but we gather the following from the record concerning it: Appellee was married in 1889, and she and her husband lived on testator's place and rented land from him that year. The year following she and her husband purchased the 40-acre tract above mentioned, adjoining her father's place and moved on it, but continued to rent about 40 or 45 acres of land from her father for each year until 1898, when she and her husband sold the 40 acres to her father. Thereafter they continued to live on the 40 acres and to rent it and the same additional 40 or 45 acres theretofore rented from her father, until 1910, as tenants of testator. During all these years there does not appear to have been any differences between appellee's husband and her father, or her brother August Stolle, although she testified that they both disliked her husband. In October, 1909, a written rental contract was entered into between the testator and appellee's husband, whereby he rented the 40 acres sold by them to testator in 1898, and the additional 40 acres of testator's land adjoining the first 40 acres. This contract recited that all improvements on the first 40 acres belonged to testator, except some beehives, which the tenant was authorized to remove at any time during the lease term. The first difference between testator and appellee's husband seems to have occurred after the above lease contract was executed, either in 1909 or early in 1910, when testator brought suit against appellee's husband to remove him from the premises as a trespasser. It was during the pendency of this suit that the trees were grubbed and the fence removed. At this time appellee says she went out and protested with her father against digging up the trees and removing the fence, and that he told her he was doing it "so the children can't get hold of it," and that if she did not go back to the house he would slap her jaws, even though she was married and had children. Based upon this and the fact that her father drank a whole lot, she thought him of unsound mind. The record shows that a few days after the digging up of the trees and removing the fence testator and appellee's husband settled their differences and an agreed judgment was entered on March 22, 1910, dismissing the suit; that on the following day, March 23, 1910, testator and

his wife conveyed by deed the 40 acres of land to appellee and her children for a consideration of $1 and love and affection which they bore their daughter, appellee, at which time appellee accepted of testator's bounty without questioning his mental capacity to make the conveyance to her. Appellee says that she never heard of any one questioning her father's mental soundness. Ten business men, neighbors, bankers, merchants, etc.; testified that Christian Stolle, testator, was until his death a man of good health and strong intellect and of exceedingly good business judgment. We are of the opinion that the record does not disclose any legal testimony establishing the mental unsoundness of testator at the time he executed the will, and the court should have so instructed the jury.

On the issue of undue influence we are also of the opinion that the evidence is not legally sufficient to establish such issue. The only evidence tending to show undue influence was the inference that might be drawn from the fact that August Stolle lived with his parents and had an opportunity to so influence them, and the inference that might be drawn from the testimony of one witness, a negro, employé of August Stolle, that August Stolle seemed to be in charge of the place, and that testator said he was "boss." In addition to the above, appellee, on the first trial of the case, testified that after she filed this suit she had a talk with August Stolle, at which time he is attributed with the statement that "he got Papa to put in the will to just give me $10," and that he caused the testator to destroy a former will in which each child shared alike. On the second trial appellee testified to the same conversation. On each of these trials she stated that she and her brother were alone when the conversations took place. From an examination of the opinion of the San Antonio court, on the first appeal, we are led to conclude that it held that as a matter of law such testimony did not establish undue influence, but reversed and remanded the case for a new trial, giving appellee a chance to make additional proof, if she could. This court upon the second appeal, based practically upon the same testimony, held that the evidence was so unsatisfactory and so against the overwhelming weight of the testimony on this issue that the case would be reversed and remanded to give one side or the other an opportunity to present other testimony. Appellee admits on this appeal that she had testified on the two former trials that her conversation was with August, "and nobody was present but August and myself;" that this is the third time she has testified about this conversation with August, "and this is the first time I have testified anything about my husband's being present and hearing any of the

conversation." She also states that this was the first time she had ever testified that her mother was present and took part in the conversation. On this trial appellee testified:

"August said he got Mr. Goldbeck to draw those wills. Mama asked him, did Papa tell him to do that, and he said, 'No; I just done it on my own hook,' and Mama said, 'Well, August, what did you want to have influence for and go there and do that, and then have Papa sign it?' and she said, 'Did you have my will made that way?' and he said, 'Yes; yours just the same.' My husband talked to August there that time when he was at our house."

Appellee's husband testified concerning the above conversation that:

"I was there and heard it. * * * August told his mother he was responsible for those things; he said he got Goldbeck to do it. He said, 'I got him to do it.' She said, 'Did your father do it?' He said, 'No; I got Goldbeck to do it, so Joe could not get hold of it.' "

[5] The witness testified that this was the first time he had ever testified to this conversation, although he was a witness at each of the other trials. Admitting as true this very unsatisfactory testimony, and conceding that August Stolle did the very unnatural act of going to the person whom he had used his influence against to deprive her of an estate and after she had sued him for it, and made the above statements attributed to him, such evidence does not establish undue influence. It may establish a case of fraud in that August Stolle caused the execution of this will through Goldbeck, without his father's knowing the contents, but not undue influence. We are aware of the rule that in determining this question we must consider the evidence in its most favorable aspect for appellee, disregarding conflicts and contradictions and disregarding all adverse evidence, and, applying the rule in its strictest sense, the above testimony does not establish undue influence. Harpold v. Moss, 101 Tex. 540, 109 S. W. 928; Eastham v. Hunter, 98 Tex. 560, 86 S. W. 323.

[6-8] It has been universally held that no hard and fast rule could be laid down as to what constitutes undue influence, but that each case must depend upon its own particular facts as applied to certain announced general principles of law. We quote the following as the general principles of law applicable to this case:

"Undue influence is defined as that which compels the testator to do that which is against his will, from fear, the desire of peace, or some feeling which he is unable to resist." 1 Schouler on Wills, § 227.

"Undue influence upon a testator consists in substituting virtually the will of the person exercising it for that of the testator. Fraud upon the testator consists in making that which is false appear to him to be true, and so af-

fecting his will. Undue influence need not be attended at all with deception or circumvention. Fraud need not be attended with undue influence, except in so far as the misrepresentation amounts to influence; there need be no pressure, such as is necessary to constitute influence." Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 98; 1 Bigelow on Frauds, p. 571; Wetz v. Schneider, 34 Tex. Civ. App. 201, 78 S. W. 394.

"The term 'undue influence' is not difficult of comprehension, but is of definition. The definitions given by the courts are varied to meet the phase of case then under consideration. The definitions are not so clear, to the untrained mind especially, as the term itself." Goodloe v. Goodloe, 47 Tex. Civ. App. 493, 105 S. W. 533 (writ of error denied 102 Tex. 583).

"Undue influence cannot be presumed or inferred from opportunity or interest, but must be proved to have been exercised, and exercised in relation to the will itself, and not merely in other transactions." Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 98; McIntosh v. Moore, 22 Tex. Civ. App. 22, 53 S. W. 611.

[9] Also that mere persuasions or entreaties will not invalidate a will on the ground of undue influence. Robinson v. Stuart, 73 Tex. 267, 11 S. W. 275. It is also necessary to prove something more than a mere suspicion of undue influence. Brown v. Mitchell, 75 Tex. 9, 12 S. W. 606; Trezevant v. Rains (Tex. Sup.) 19 S. W. 567.

[10, 11] Evidence of opportunity and the fact that a former will differing from the latter had been destroyed by the testator would not establish undue influence. Barry v. Graciette (Tex. Civ. App.) 71 S. W. 309. In order to set aside the probate of a will on account of undue influence, the burden is on him who is attacking the will to show the testator had been induced to act contrary to his own wishes and to make a different will from one he would have made had he been left entirely free to act according to his own judgment and discretion. His free agency must have been shown to have been destroyed by the influence of another, and that influence must have been in force and effect at the very time of the execution of the will. Barry v. Graciette, herein cited.

"Undue influence, legally speaking, must be such as in some measure destroys the free agency of the testator. It must be sufficient to prevent the exercise of that discretion which the law requires in relation to every testamentary disposition. It is not enough that the testator is dissuaded by solicitation or argument from disposing of his property as he previously intended; he may yield to the persuasion of affection or attachment, and allow that sway to be exercised over his mind; and in neither of these cases would the law regard the influence as undue. To amount to this, it must be equivalent to moral coercion—it must constrain its subject to do what is against his will, but which from fear, the desire of peace, or some other feeling, he was unable to resist, and, when this is so, the act which is the re-

sult of that influence is vitiated. Gilbert v. Gilbert, 22 Ala. 529 [58 Am. Dec. 268]. * * * To avoid a will on the ground of undue influence, it must appear that the influence was exercised upon the very act of making the will. The fact that the testator was under the general and even the controlling influence of another person in the conduct of his affairs will not suffice to invalidate the will, unless that influence was specially exerted upon the testamentary act." Patterson v. Lamb, 21 Tex. Civ. App. 512, 52 S. W. 98.

Applying the above general rules to the facts in this case we must conclude that the testimony of Sandy Nixon, August Stolle's subtenant, that August Stolle appeared to be in charge of the place and that testator told him August was "boss," does not establish undue influence, but to the contrary it is in keeping with all the testimony that during his old age testator left the management of his property to August Stolle. Neither do we think that the opportunity on the part of August Stolle to influence his parents by reason of his living with them, and the fact that the later will differed from the former will, in absence of any other act on his part, would be sufficient proof to establish the use of undue influence by August Stolle in the execution of the latter will. There is no evidence showing that August Stolle ever mentioned the execution of the will in question to his father, or that he ever sought its execution. Goldbeck, the scrivener, testified that he drew many papers for testator, including the will, and that August Stolle was never present at the execution of any of them; nor did he ever mention the execution of any of these matters to him. The testimony shows that the testator took his wife, and they together went to the office of the scrivener, who read the will to him, and he signed it, and that no influence was either directly or indirectly brought to bear upon the testamentary act, but that it was the act of an intelligent man acting of his own free will and accord.

[12] Appellee's testimony that, because August Stolle disliked her husband and knew that her father also disliked him, he had an opportunity to fraudulently use this situation to induce the execution of the will in question, is not supported by any testimony except the opportunity to do so, and the fact that the will executed was different from a former one, and does not establish undue influence for two reasons: First, because there is no proof whatever that August Stolle and appellee's husband ever so much as had a cross word until after the death of the testator; and, second, the dislike which testator bore appellee's husband evidently needed no tutoring on the part of August. Appellee testified that her father objected to her marriage; the record shows that about the time of the execution of the will testator and appellee's husband were involved in a lawsuit. And, whether he liked or disliked his son-in-

law, he had the legal right to dispose of his property as he saw fit, and undue influence cannot be predicated upon this fact alone. As to the former will which was executed more than 20 years before the one in question, we do not see that it even bears remotely upon the question of undue influence. It was executed in anticipation of and immediately before testator and his wife took a journey back to the old country, Germany. At this time August Stolle was a minor. At this time the debts against the land had not been paid off. August Stolle after this time, and after he became a man, remained at home and cared for the testator and his wife, and the testator no doubt, under such circumstances, had reasons to favor him more than his other children, who had not rendered him such service.

[13] Appellate courts are always slow to set aside the verdict of a jury where it is supported by any legal testimony, but in this case the jury's verdict is not based upon any legal testimony. The facts and circumstances standing alone in this case are not legally sufficient to warrant the finding of the jury. It is easy to imagine that under circumstances where the opportunity exists undue influence could be exerted, but the proof must go further and show that it was so exerted.

There is one reason why our courts have universally held that undue influence cannot be presumed or inferred from opportunity or interest, but must be proved by additional facts which relate to the execution of the will itself. The scrivener testified that at the time testator executed this will August Stolle was not present; that August Stolle never spoke to him about it; that testator was of sound mind and sober at the time he executed the will. All of the disinterested witnesses testified that testator was of vigorous constitution and in good health; that he was intellectual and of good business judgment; and we submit that the testimony adduced presents nothing more than a circumstance, where undue influence might be inferred from opportunity or interest, and is not sufficient as a matter of law.

[14] We are of the opinion that the evidence is insufficient as a matter of law to establish either mental incapacity on the part of the testator, or that he was unduly influenced to execute the will in question, and the case is therefore reversed and rendered in accordance with this opinion.

Reversed and rendered.

## On Motion for Rehearing.

This opinion on motion for a rehearing is substituted for our former opinion on motion for rehearing, filed February 21, 1924, which latter opinion is hereby withdrawn.

[15, 16] Appellee insists, in her motion for a rehearing, that this court went beyond its power in reversing and rendering the judgment in the case at bar, but that our province was to award a new trial only. This court has the power to determine from the evidence adduced on the trial of a case whether as a matter of law it is sufficient to support the judgment rendered, and, if it determines that the evidence is not as a matter of law sufficient to support the judgment rendered, then it may reverse and render the case. We do not recede from our former opinion that the evidence adduced is insufficient as a matter of law to establish either mental incapacity on the part of the testator, or that he was unduly influenced to execute the will in question; but, admitting only for the sake of the question raised that the issues of mental incapacity and undue influence were raised by the evidence, still the evidence is so overwhelmingly against the verdict of the jury that we could not permit it to stand. Our only alternative then would be to reverse and remand the case for the fourth time for a new trial. Appellee's husband testified on this trial that he had gone over the county and searched diligently for testimony bearing upon the issues raised by the pleadings, and that the testimony adduced was all that could be had. It would, therefore, be useless to reverse and remand the cause solely to permit appellee to again reiterate the same testimony heretofore adduced on the three trials already had. No doubt, on another trial, in view of the decision of the Supreme Court in the recent cases of Leahy v. Timon, 110 Tex. 73, 215 S. W. 951, and Holland v. Nimitz, 111 Tex. 419, 232 S. W. 298, 239 S. W. 185, construing article 3690, R. S. 1911, to apply in cases of this character, appellant's counsel would object to practically the whole of appellee's testimony as being "transactions with or statements by the testator." This being true, appellee's testimony relating to the acts, conduct, and statements of deceased testator, upon which she based her opinion of his lack of mental capacity to execute the will, and of the exercise of undue influence upon him, would have to be excluded on another trial.

Appellants objected to all the testimony, and moved its exclusion, and for an instructed verdict, upon the ground that it was insufficient as a matter of law to establish either the issue of mental incapacity or undue influence; but did not make the specific objection that any of the testimony was violative of the article of the statute above referred to. Whether the general objection that the testimony should be excluded because insufficient as a matter of law would sufficiently present an objection to testimony because violative of article 3690, R. S., is a matter upon which we do not deem it necessary to pass in this case, as we have considered the whole of the evidence in arriving at our decision; but refer to the matter here for the purpose of showing that it would be a futile thing to do to again reverse the case,

knowing that a large portion of the testimony must be excluded under the holding of the cases above cited.

[17] It was held in the Leahy-Timon Case, supra, which is a case exactly like the one at bar, article 3690, R. S. 1911, applied to an action by heirs of a testatrix to set aside the probate of her will on the ground of undue influence by a devisee, and lack of mental capacity by the testatrix. The plaintiffs were not entitled to testify to statements by the testatrix to them, tending to show such undue influence and mental incapacity. And it was held in the case of Holland v. Nimitz, supra, that, in an action by an heir contesting the probating of a will, such heir would not be permitted to testify to an opinion as to sanity of testator, though restricting such opinion, by the form of the question and answer, to results of observations of acts, conduct, and physical condition of testator, and not basing it on conversation with or statements made by him, as being in violation of the provisions of article 3690, R. S. 1911.

These cases are directly in point in this case; and, for the reasons stated in our original opinion and in our opinion here, we overrule appellee's motion for a rehearing.

Motion overruled.