### BRODT et al. v. BRODT et al.

#### No. 9717.

Court of Civil Appeals of Texas. San Antonio.

Feb. 5, 1936.

Rehearing Denied March 4, 1936.

Knetsch, Stevenson & Knetsch, of Seguin, and Egbert, Schweppe, of San Antonio, for appellants.

A. P. Mueller and R. A. Weinert, both of Seguin, for appellees.

MURRAY, Justice.

Appellants, Henry Brodt, Mrs. Annie McHugo, Mrs. Georgia Bowles and husband, Will Bowles, Mrs. Florence Maurer and husband, John Maurer, and Charles Smidt, filed their exceptions and objections to the probate of an alleged will of Hermann Brodt, deceased, in the county court of Guadalupe county. Alvin Brodt, the proponent of the alleged will, was named in same as a beneficiary and as independent executor. Other beneficiaries under the proposed will, other than Alvin Brodt, were Wm. Brodt, Sr., Willie Brodt, Jr., Aug. Brodt, and Mrs. Edna Puls (Otto Puls was a party only pro forma as the husband of Mrs. Edna Puls).

The will was ordered probated in the county court of Guadalupe county, and an appeal taken to the district court, where a trial was had de novo before a jury and judgment again entered ordering the probate of the bill, and, from this judgment, appellants, who were the contestants below, have prosecuted this appeal.

The trial judge submitted the cause to the jury on one special issue which inquired of the jury as to whether Hermann Brodt, the alleged maker of the bill, had mental capacity to make a will on Feb-

ruary 11, 1934, the day on which the supposed will was alleged to have been executed. The jury answered this issue in the affirmative. The issue as to undue influence was not submitted to the jury.

Appellants' first six propositions complain of the trial court's failure to submit to the jury the question of undue influence alleged to have been practiced upon Hermann Brodt, the alleged testator, by both Alvin Brodt and Wm. Brodt, Sr. Appellants' entire contention and complaint is fully set out in their third proposition, which reads as follows:

"Where Contestants alleged that the Proponents unduly influenced Testator in the making of his Will, and the proof offered by Contestants showed that Testator was aged and infirm at the time of making said Will; that he was desperately sick, and had been ill for several months prior thereto; that he was suffering excruciating pains and had to have morphine administered to him just prior to making the Will and shortly thereafter; that proof for Contestants showed the administering of ¼th grain of morphine would weaken testator's mind and make his mind more susceptible to influence and importunities; that he was then, and had been for some time, residing in the home of Proponents, who were principal beneficiaries under the Will; that Proponent, Alvin Brodt, upon several occasions had discussed with Dr. Poth the matter of his Uncle, Testator, making a Will; that said Proponent was instrumental in seeing that the Will was made; that said Proponent was present when the Will was made; that said Proponent made a statement a few hours before the purported Will was executed, in the presence of Contestants 'that although there was no Will, there would be a Will'; that Proponents were present when it was made, but none of Contestants were present; that no ill-will existed between Contestants and Testator, but on the contrary their relationship was very friendly and congenial; that the Testator had just shortly before his death expressed a desire to Contestants that he wanted to distribute his property equally among his heirs; that by the terms of his Will offered for probate Testator did a very unnatural thing in that he completely disinherited his only living sister, who was not only on friendly terms with Testator, but visited him at regular intervals and always brought him a good lunch to his ranch home in Guadalupe County, he being a bachelor; and that Testator made two purported Wills within a short period of not over two hours, the terms of which were radically different, and the latter much more favorable to Proponents than the first, such facts and circumstances, if believed by the Jury, were amply sufficient to warrant a finding that Testator was unduly influenced, and it was the duty of the Trial Court to have submitted such issue to the Jury for determination."

All of the circumstances and facts set forth in proposition 3, above, are borne out by the record, with a few exceptions, which we will now point out. It is clear that appellants do not contend that Alvin Brodt was actually in the room where the will was executed, but only that he was on the same premises. Contestants called Alvin P. Mueller, Esq., to the witness stand, and developed from him the following testimony which stands uncontradicted:

"Q. What is your name? A. Alvin P. Mueller.

"Q. Your profession, please? A. I am an attorney and in the abstract business.

"Q. This will just read to the jury, state whether you prepared that will. A. I did.

"Q. Will you please state what day of the week it was when you prepared the will? A. As near as I recall, it was on a Sunday.

"Q. What time of the day on Sunday? A. Late in the afternoon.

"Q. What time, will you state, before or after dark? A. Well, it was right after dark, possibly 7:00 or 8:00 o'clock, something like that:

"Q. Were you called to come to any one's house to prepare this will? A. Yes, sir.

"Q. Do you know who called you? A. I do not remember at this time who called me, but I was called, somebody called me over the telephone to come up to William Brodt's house, that is the brother of Hermann Brodt. I think I made inquiry as to why and what was the matter and the party that phoned me told me they would like for me to write a will for Hermann Brodt, who was sick.

"Q. Hermann Brodt, who was sick? A. Yes, sir.

"Q. Where was Hermann Brodt while you prepared this will? A. He was in bed.

"Q. Who was present? A. You mean in the room?

"Q. Yes. A. Sara Haag, and his brother, August Brodt.

"Q. Who was around in the building, in the home there? A. Well, in the next room there was nobody in there, we had the door closed, and I don't know who was in there, but I don't think anybody was in there. As I walked in, after I got there, in the second room away from that one, there was Mr. William Brodt and Willie Brodt, and Mrs. Brodt and Alvin Brodt, and possibly somebody else, but I do not know who all, but there were several members of the family sitting in that room that I walked through as I went into the room of Hermann Brodt.

"Q. Did Hermann Brodt write anything in reference to this will except his signature? A. That is all.

"Q. Is that the way he wrote that? A. Yes, sir, that is the way he wrote it.

"Q. Did he write it by himself or did he have any assistance in writing his name? A. He had no assistance; he wrote that himself.

"Q. Are you familiar with his signature? A. In a general way, yes, sir, I am, but I don't know that I could qualify as an expert on handwriting.

"Q. Did you write this will just continuously all the way through with the same pen and same ink? A. I wrote everything except one interlineation that I made after I wrote the will for him and he wanted one addition made, and you will find one interlineation made there.

"Q. Who was present when that interlineation was made? A. The same party, Miss Haag, and August Brodt, and myself.

"Q. That interlineation affected August Brodt, did it not? A. Yes, sir, it did. It was made before the will was signed.

"Q. Did you have a fountain pen to write this with or did you just use pen and ink? A. Now, you asked me a question there that I don't know. As I remember, I believe, I had a fountain pen, but I would not be positive.

"Q. Did you ever change pens in the writing of this instrument? A. I don't know, I couldn't say about that.

"Q. Now, you can tell, can you not that on this sheet, in the first part, it is written in one kind of ink and there in the other part it is written with another kind of ink. Now, can you account for that? A. Can I account for that?

"Q. Yes, sir. A. I don't remember why that was.

"Q. Do you state to this jury that the entire will is in your handwriting? A. Yes, sir, every word of it; every letter of it.

"Q. How long did it take you to prepare this will? A. Oh, probably three quarters of an hour.

"Q. What time of the night did you leave there? A. It might have been 9:00 o'clock that night or it might not have been that late.

"Q. State whether or not Hermann Brodt became unconscious before you left? A. He did not.

"Q. Was the doctor called? A. No, sir.

"Q. State whether or not there was any telephone message to San Antonio prior to your leaving about his condition, that you know of. A. No, sir, there was not.

"Q. What time of the day were you phoned to come over there? A. As near as I recall, it was between 7:00 and 8:00 o'clock.

"Q. Immediately upon getting there did you begin writing the will? A. No, I talked to Mr. Brodt first before I wrote the will.

"Q. Who did you first meet when you got there? A. Well, I think Willie Brodt was on the front gallery, or at the front door.

"Q. Did you meet Alvin Brodt? A. Yes, sir.

"Q. Where did you meet him? A. He was there, I think, with Willie.

"Q. Did either one make any statement to you? A. No, sir.

"Q. Did they ask you what you wanted? A. No, sir.

"Q. Did you discuss with them what they wanted with you, as to why you came over there? A. No, sir.

"Q. When did you see Willie Brodt, Senior? A. He was in the room that I passed through, in and about the room.

"Q. Did he speak to you? A. I think when I got on the inside of the bedroom, he did.

"Q. Did anybody direct you to Hermann Brodt's room? A. Yes, sir.

"Q. Who was it? A. I think it was Will.

"Q. Willie? A. Willie Brodt; or it may have been Alvin, I don't know which, one of those told me where to go.

"Q. Did they show by their actions or words that they were expecting you? A. yes, they did not. ask what I wanted. I went in there and then they asked me to come into the room where Hermann Brodt was.

"Q. Who asked you? A. Willie and Alvin both.

"Q. Then you went into the room and closed the door? A. Not right away.

"Q. When was the door closed? A. When I got there I went to where Mr. Hermann Brodt was lying on the bed; he was lying with his face away from the door. I came in, and I don't know whether he was sleeping because August Brodt, or one of the family went over there and told him that I was there.

"Q. Had that matter ever been discussed with you prior to that date? A. No, sir.

"Q. At any time, to write a will, just answer yes or no. A. No, sir, so far as I remember that was the first time I had heard of that.

"Q. Were you advised of the urgency? A. Nothing except that they told me that Hermann Brodt was sick and that they would like for me to come up right away and write a will.

"Q. And this was on a Sunday? A. As near as I remember, yes, sir, it was on a Sunday night.

"Q. Had you retired for the night? A. No, sir.

"Q. Do you know when Mr. Hermann Brodt died? A. I know by hearsay; yes, sir.

"Q. Did you attend the funeral? A. No, sir, I wasn't in town that day.

"Q. How long had you known Hermann Brodt? A. Fully ten years, if not longer.

"Q. Other than his own statement was there any indication to you that he was sick? A. No, sir.

"Q. Were you paid for your professional services rendered that night at that time?" (No answer.)

It was also shown by Dr. N. A. Poth, a witness for appellants, that Hermann Brodt, deceased, was of sound mind on February 11, 1934, that he understood the nature of his property and the disposition he was making thereof.

It is proper to add these facts to the statement set forth by appellants, because, while appellants are entitled to have the testimony considered in the most favorable light in determining whether there is an issuable fact to go to the jury on the question of undue influence, they cannot escape the effect of positive and direct testimony offered by themselves, which is undisputed and stands out as the uncontradicted facts of the case.

█ It is clear to us that the most that this testimony does is to show that Wm. Brodt and his son, Alvin Brodt, had an opportunity to exercise undue influence, or it might be construed as raising a suspicion or surmise that they might have exercised such an influence. This is not enough to raise an issuable fact for the jury. Stolle v. Kanetzky (Tex.Civ.App.) 259 S.W. 657; Brown v. Mitchell, 75 Tex. 9, 12 S.W. 606; Trezevant v. Rains (Tex.Sup.) 19 S.W. 567.

It is held in Robinson v. Stuart, 73 Tex. 267, 11 S.W. 275, that mere persuasions and entreaties will not invalidate a will on the ground of undue influence.

█ In Pierson v. Pierson (Tex.Civ. App.) 57 S.W.(2d) 633, 636, it is aptly said:

"Whatever the refinements it may have otherwise gone through, the phrase 'undue influence' has acquired in our jurisprudence, as applicable to the simple question here involved, a well defined legal meaning in these two respects: First, as to what it is; second, as to the quantum of proof required to establish it.

"Under the first of these, it has thus been acceptably defined: 'To be classed as undue, influence must place the testator in the attitude of saying: "It is not my will, but I must do it." He must act under such coercion, compulsion or constraint, that his own free agency is destroyed.' [Citing cases.]

"Under the second, it has been quite generally held as follows: 'Undue influence cannot be presumed or inferred from opportunity or interest, but must be proved

to have been exercised, and exercised in relation to the will itself, and not merely to other transactions.'"

In Morris v. Bailey, 16 S.W.(2d) 311, 312, we find the following:

"The fact that the testator bequeathed his property to an aunt and two nieces, making no provision for his brothers and sisters and other nieces, we think alone was without probative force. And we think the testimony showing that the testator lived with said appellee Mrs. Dollie Bailey, and that she therefore had an opportunity to improperly influence him if she could and was willing to do so, did not make an issue for the jury as to whether she did so influence him or not."

See, also, Houston v. Holmes (Tex.Civ. App.) 262.S.W. 849; Mathews v. Mathews (Tex.Civ.App.) 275 S.W. 226; Kophal v. Jantz (Tex.Civ.App.) 297 S.W. 336; Wilson v. Paulus (Tex.Com.App.) 15 S.W. (2d) 571.

We overrule appellants' contention that the trial court committed error in not submitting the question of undue influence to the jury.

Appellants next complain that they were not permitted to prove by the witness, Charles McHugo, that he heard Mrs. Wm. Brodt make a statement in the presence of Alvin Brodt with reference to guns. Mrs. Wm. Brodt was not a party to the suit, and such testimony was properly excluded by the court as hearsay.

Appellants also complain of the action of the trial judge in not permitting Mrs. Annie McHugo, a party to this suit, to testify to the mental condition of the alleged testator, Hermann Brodt, deceased. This witness, being only a lay witness, would be required to first state all of the facts upon which her opinion was based before she could be heard to express an opinion that Hermann Brodt was of unsound mind, and such facts would involve transactions with the deceased, which this witness, a party to the suit, would not be permitted to relate. Article 3716, R.S. 1925; 24 Tex.Jur. p. 427; Stolle v. Kanetzky, supra.

Accordingly, the judgment of the trial court is in all things affirmed.