**BASS et al. v. BASS.**

**No. 9665.**

Court of Civil Appeals of Texas. Austin.

Nov. 28, 1947.

Rehearing Denied Dec. 17, 1947.

Edw. C. Thomas, of Victoria, S. G. Sample, of Edna, and Putney & Ritchey, of Victoria, for appellants.

Crain, Vandenberg & Stofer, by J. V. Vandenberg, Jr., and F. H. Crain, Carsner & Carsner, by C. C. Carsner, and C. C. Carsner, Jr., all of Victoria, for appellee.

HUGHES, Justice.

This is a will contest. Laura L. Bass, appellee, is a daughter of and principal beneficiary under the alleged will (hereinafter called "will") of Millard F. Bass, deceased. Appellants are the remaining heirs at law of decedent and include his widow, five daughters, and two grandchildren.

The contest, filed in the county court, resulted in a judgment probating the will. On appeal to the district court trial was before a jury and at the conclusion of the evidence the trial judge instructed a verdict

for appellee, and in accordance therewith rendered judgment sustaining the will.

The contest was based on two grounds: (1) testator's lack of mental capacity and (2) undue influence exercised upon testator by appellee.

*Mental Incapacity.*

Millard F. Bass died in Victoria County, August 26, 1944, at the age of about 89 years, leaving an estate of the reasonable value of $50,000.

The will in question was executed October 7, 1943, by testator signing with his mark.

Testator is shown to have made a will on February 5, 1935, in which he left his estate to his wife for life and remainder in equal shares to his nine children and $1,000 to a granddaughter.

On April 30, 1936, testator made a new will similar to his first will, except that he included another grandchild and virtually disinherited two sons.

By codicil dated April 25, 1939, another son was eliminated from the April 30, 1936, will.

By another codicil dated February 12, 1940, testator gave his wife the right to sell all or any part of his estate and to make mineral leases and provided for partition of his property.

Testator was about 88 years of age when the will of October 7, 1943, was made. He was then practically deaf, almost, if not totally, blind, confined to his bed and suffering with a cancerous condition of his sinuses or nose, which caused hemorrhages, leaving him in a weakened and stupid condition, with severe head pains and aches.

On the day of his making his last will he was a very sick man; his doctor was called and members of the family were summoned by telephone. The following day he was sent to a hospital and placed in an isolation ward. While there he raved and attempted to and did get out of bed. The nurse in the hospital was afraid of him and his bed was fenced to keep him in. He kicked, or attempted to kick, appellee.

It was shown that in 1936, shortly after the death of one of testator's sons, testator was very despondent and tried to kill himself with a knife, but was prevented by others present.

Only lay witnesses, all grandchildren of testator, expressed opinions that on October 7, 1943, testator was of unsound mind. The substance of their testimony is:

*Estelle Noble.*

Twenty-six years of age, a school teacher of 8 years experience and now employed in Edna High School. When quite small she visited in testator's home frequently, but in later years visits were 3 or 4 months apart, this because family relationship seemed broken and witness received no pleasure from visits. On each visit she saw testator. Death of uncle (son of testator) in 1936 was recalled. Witness attended funeral and saw testator who seemed "terribly disturbed" and stated over and over that he had nothing to live for after he lost his son. After son's death testator's physical condition changed for worse; spent most of his time in bed; could not see or hear and suffered with his head; had to be assisted to get out of bed. On October 7, 1943, testator suffered a hemorrhage, witness having been called home by her mother. Testator was pale and appeared very sick, was listless and had nothing to say. When asked how he felt replied that he was in bad shape and had never been in such condition before. Spots of blood were on bed clothing and floor. Appellee on this occasion told witness that a day or two before some gentlemen had been out to transact some business and had requested her to leave the room, and that testator had suffered a hemorrhage, was very sick, had been in a rage and out of his head a day or two before. Between 1936 and October 7, 1943, witness had observed her grandfather's mental condition. Three or four years before his death his mental capacity seemed to have weakened, he would repeat the same question three or four times in the course of a few hours. Testator had developed an unpleasant attitude towards his grandchildren and most of his children, and spoke slightingly of their business ability and ability to take care of themselves, and of their intelligence.

*Laura Harris.*

Thirty-seven years of age, married and has two children, worked two years at Foster Field as mechanic's helper, and has 98 semester hours of college credits at Praire View.

From 1936 to 1939 she saw testator often. During first three years after son's death testator was nervous and beginning to get irritable and rave and rant; his conversations were not agreeable. He criticized witness's marriage; told her she was a fool; that a woman's place was in the home and she was out of her place in working as a mechanic's helper, and asked her if she caused that last plane to crash.

Witness saw testator in hospital on October 8, 1943, and was not sure that he recognized her. Appellee told witness in presence of testator, on this occasion, that he took a drink of water and asked for the table, and finding none he said, "Looks like they could afford a bedside stand." Appellee told witness that testator "cut up so bad" that she had to keep table away, and also told her a screen was used to keep him in bed, and about his raving. Witness testified that testator was quieted down nicely when she got there. On Monday, October 10, 1943, testator told witness he was better, had no business in the hospital, and everybody was trying to rob him.

Appellee also told witness that her father, while in the hospital at that time, got mad and tried to "kick her out of the corner."

Witness saw testator next and for the last time on Christmas 1943. He was at home and in bed and was upset. He had a misunderstanding as to why the family was gathered.

This witness also testified to the physical break down of testator beginning in 1936, his blindness, deafness, hemorrhages and resulting lassitude and head pains and forgetfulness; and that appellee told her, "Don't mind papa. He is getting childish and feeble."

*Octavia Cook.*

Age 34, taught school 12 years, lacks 16 hours credit necessary to secure BA degree from Sam Huston College.

During last two or more years of testator's life she saw him every three or four months. In 1940, when testator was in the hospital, she read the newspaper to him and by reading loud he could understand. At this time he was very disagreeable, accused everyone of lying about the condition of his crops, and stated that he was hospitalized just so people could get his money. When witness attempted to wait on him he would have "rages" and he almost fell out of bed in one of these spells.

After a hemorrhage testator would be drowsy and stupid and have nothing to say.

Testator until about 1941 had been generous and liberal with witness, giving her clothes and money. When this stopped witness did not visit him so often. Testator during last three years of his life fell out with his family and called them shiftless and spendthrifts. In the fall of 1943, when testator was in the hospital, he did not recognize witness until some one told who she was.

This witness also testified to testator's physical condition and the suicide incident about the same as set out above.

In support of their contention that the above evidence raised an issue of mental incapacity, appellants rely principally upon the following "fact" cases: Galindo v. Garcia, Tex.Sup., 199 S.W.2d 499; Chambers v. Winn, 137 Tex. 444, 154 S.W.2d 454; White v. White, 141 Tex. 328, 172 S.W.2d 295; Mills v. Kellahin, Tex.Civ.App., 91 S.W.2d 1097 (Writ Dis.); Trezevant v. Rains, Tex.Sup., 19 S.W. 567; and Reiche v. Williams, Tex.Civ.App., 183 S.W.2d 587, affirmed 143 Tex. 365, 185 S.W.2d 420.

In Trezevant v. Rains verdict of the jury upholding a will was attacked as being without supporting evidence. Testatrix died from consumption within eleven days after executing the will. Attending physicians and subscribing witnesses testified that testatrix was physically weak and prostrate but that her mind was clear and rational, and that she was mentally sound. The verdict of the jury was held to be amply supported by the evidence.

In Mills v. Kellahin the jury found that testator lacked mental capacity. This find-

ing was attacked as being against the undisputed evidence. Testator was 90 years of age and was suffering from various ailments, including chronic nephritis and arteriosclerosis. Several doctors testified that testator was suffering from senile dementia and was of unsound mind. The jury finding was not disturbed.

In White v. White a deed was attacked on the ground that the grantor lacked mental capacity. The trial court instructed a verdict for defendants. This was held erroneous. The evidence there showed that grantor was 75 years of age, suffered general heart trouble and asthma and had developed a dropsical condition several days before the deed was executed. A doctor testified as to the effect of these diseases upon the mind and concluded that a person in the condition of grantor could not "act intelligently about anything," and a lay witness testified that grantor's conversation was not normal.

In Chambers v. Winn the lower courts had held there was no evidence sufficient to raise the issue that testator was incapable of making a will. These judgments were reversed, the evidence showing that testator was 66 years old. He left his property to a stranger. His relationship with his brother and sister had always been friendly. He had a "spell" several months before his will was made. After he became ill he acted "peculiarly", cried when talking about his friends, had hardly any memory, his conversations were rambling, and he acted like a small child.

In Reiche v. Williams the Supreme Court held the following evidence to raise the issue of mental unsoundness: A doctor stated that he had treated testatrix four or five years and that she was of unsound mind. A lay witness testified that she was very nervous; that testatrix kept witness awake at nights and was always saying that someone was trying to break in the house; would get scared and cry at night; that her deceased husband came to her over the transom and told her not to drink coffee or chew tobacco; and concluded that testatrix was of unsound mind.

In Galindo v. Garcia the following testimony was held sufficient to raise the issue

of testamentary capacity: Testator was 75 years of age. He was blind. A lay witness testified that he was of unsound mind, the opinion being based largely on these incidents: that testator told witness he had received a message that his sister who lived in a distant town was dead. This proved untrue and testator denied receiving such message. Another time testator requested witness to get the address of a friend who was dying in Laredo. When the address was procured testator was indifferent to the information.

Other lay witnesses based their opinions of mental incompetence upon the rambling nature of testator's talk; his crying; his confusion of night and day; the shaking of his head; and belief that people were trying to kill him.

We do not consider these cases, because of fact differences as compelling reversal of this case.

It is true that Millard F. Bass was an old and very sick man. He was blind, or nearly so, and this certainly accounted for his inability to recognize people. He was deaf, or nearly so, and this must have contributed to his failure to converse freely. He became unfriendly with his family. One of his sons was jailed for assaulting his father. Other children antagonized him in various ways. Some of the grandchildren quit going to see him so often when he became less generous. These estrangements prevent the will from being held undutiful or unjust. 44 Tex.Jur., p. 618.

Statements that some of his children were fools, spendthrifts and shiftless, even if uncalled for, can easily be attributed to the natural condemnation of one who had by thrift and hard work acquired a sizeable estate, might in his old age make upon the young and modern generation.

That testator raved and attempted to get out of bed while in the hospital is accounted for by his physician that this was due to morphine given to stop the flow of blood from his nose and that when the morphine died out he became normal. Conduct under some circumstances might be entirely rational and under different circumstances the same conduct would be very irrational. For instance the normal antics of a sport en-

thusiast at an athletic contest would be abnormal in church or school. So testator's conduct while under the influence of morphine is not proof of mental incapacity.

That testator complained that he was being robbed at the hospital merely showed that he was aware of the value of a dollar acquired by hard labor and was but his choice of language in disapproving of present prices.

The one irrational act ascribed to testator was the attempt to commit suicide in 1936, immediately following the death of his son. The cause of this was undoubtedly due to his despondency. He lived about eight years after this incident, suffered with a very painful disease and died a natural death. Suicide was never again attempted. The circumstances under which this incident occurred and its remoteness induce the conclusion that it is without probative value upon the issue of mental capacity.

The facts upon which the lay witnesses, all grandchildren, based their opinions that testator was of unsound mind being insufficient to support such conclusion, the opinions themselves are without probative value.

We, therefore, hold that the trial court was not in error in directing a verdict upon this phase of the case.

*Undue Influence.*

■ After an absence of many years, appellee in 1936 returned to the home of her father and mother and resided with them continuously until the death of her father in 1944. She ministered to their needs, managed the farm under the direction of her father, and worked as a laborer in the field, for all of which she received no compensation, other than her keep.

Appellants allege that this was all for the purpose of procuring her father's estate. If this were appellee's motive, and if it be assumed that such motive be evil, the lawfulness of her design must still be measured by the means employed to carry it out. There can be no doubt but that appellee in bestowing care, love and affection upon her parents in their declining years influenced her father in leaving her his estate. No one would say, however, that this is undue influence sufficient to void the will.

■ In addition to the facts already stated in this opinion, the following evidence is referred to as making an issue of undue influence:

A doctor was summoned by appellee on the day the will was made to examine testator.

On the day before the will was executed testator told appellee what its contents would be and this information was again divulged to her on the day the will was executed. That appellee was present in the home, but not in her father's room, when the will was signed, and that she concealed until after his death the fact that a will had been made. That appellee filed the will for probate within four days after her father's death and five days later applied for appointment as guardian of her mother, alleged to be non compos mentis. That appellee did not offer herself as a witness on the trial of the case.

It is also shown that after appellee returned home testator ordered one of his sons to leave home because of disagreement as to Governor O'Daniel's old age assistance program; a daughter was ostracized because of an argument over the firing of a Mexican farm hand; Orian, the son who assaulted his father, was relieved from management of the farm.

Appellants assume that appellee was responsible for these difficulties and that they were engendered in furtherance of her scheme to acquire her father's property.

The will was prepared and executed under the following circumstances as testified to by attorney C. C. Carsner, Sr., who was called as a witness by appellants:

About three weeks before the will was signed the witness received a message from W. H. Smith, a hardware merchant of Victoria, Texas, as a result of which he went to testator's home and talked with him alone, testator requesting his will to be prepared and giving detailed instructions as to its contents. A rough draft of the will was made and taken by Mr. Carsner to testator about one week after the first visit. Mr. Carsner read the draft and he and testator discussed each paragraph as it was read, during which only the two were present. Testator suggested one change in the will—

that his son Orian be left a small bequest. On the morning of the day on which the will was executed, about three weeks after the request for its preparation had been made, Mr. Carsner visited testator for the purpose of ascertaining the amount of the bequest to Orian. No one else was present at this time. Mr. Carsner then returned to his office, put the will in final shape, and notified Mr. Smith and a Mr. Fiek, proposed witnesses, and arrangements were made to go to the Bass home about noon. These three arrived about 12:30 p. m. and were closeted alone with testator about one hour, during which the will was read and explained to testator, who used an earphone, paragraph by paragraph. The will was then subscribed and witnessed as required by law.

Barksdale v. Dobbins, Tex.Civ.App., 141 S.W.2d 1035 (Writ Ref.), where a jury finding of undue influence was sustained, is cited by appellants. The facts in cases of this character are seldom if ever identical, and in the cases cited are far too long to be extensively reviewed here. As distinguishing this authority from the case at bar we refer to this evidence there found: Proponents of the will virtually kept testator under guard. They had him watched with instructions not to let him sign any papers. They stated that he was easily influenced, had the mind of a child, and was not capable of taking care of his business.

Long v. Long, 133 Tex. 96, 125 S.W.2d 1034, is also discussed at length by appellants. The court held there was some evidence of undue influence exerted by Frank O. Long, it appearing that he employed and paid the attorney who wrote the will, gave such attorney full instructions as to how the will was to be drawn; that the attorney never consulted testatrix as to its contents; that the will was changed several times at the request of Long and when drawn to his satisfaction Long conveyed him to the home of testatrix, where it was read to her and signed without comment.

These cases, as well as others cited by appellants, are far from paralleling the state of evidence before us. Appellee is shown to have had the opportunity to exercise undue influence and she was preferred by the will. That she ever said or did anything to unduly influence or even suggest the making of any will is not shown. Appellee should not be condemned for taking care of her aged and ill parents by accusations based entirely upon surmise and suspicion.

In our opinion there was no evidence requiring the submission of the issue of undue influence to the jury. Brodt v. Brodt, Tex. Civ.App., 91 S.W.2d 837 (Writ Dis.); Pierson v. Pierson, Tex.Civ.App., 57 S.W.2d 633 (Writ Ref.).

 Appellants assign error to the exclusion of the following evidence:

(a) Estelle Noble would have testified that appellee told her testator tried to kill himself the year after (witness thought) the death of his son.

(b) Aljurita Williams would have testified that appellee told her on the day of, but after, the execution of the will that testator was very sick and had never been in that shape before.

(c) Testimony of appellee given in the county court to show that she did not there tell the truth as to (1) when testator was taken to the hospital after making his will; (2) where appellee was, at home or in the field, when the will was made; (3) whether testator had a hemorrhage on the day the will was signed.

(d) Testimony of appellee in the county court that her father told her about the will after, but on the day of, its execution; that her father had been in bed two years and that appellee had heard that attorney Carsner and the witnesses to the will were coming to the house on the day the will was made; that appellee's sister and a Mexican had a dispute over keys to a gasoline tank, the sister trying to fire the Mexican and testator preventing this; that testator told his son that everyone ought to own and save something for themselves, and ordered the son from home when he explained the O'Daniel old age assistance program; that testator agreed to a family reunion showing reconciliation with children; that testator tried to kill himself in 1936, and appellee had to keep guns away from him, and on doctor's advice ordered testator not to attend church; that appellee's testimony that children and grandchildren did not always come to see father when called was untrue;

the absence of appellee from parents home from 1912 to 1936 and how she had lived during those years.

Blackwell Brooks offered to testify that late in 1941 he told appellee to be careful and keep things out of testator's way because of what he might do to himself, and she replied, "I will."

Allahmira Myers, one of appellants, offered to testify that within three or four years of testator's death, appellee told her that he was driving her crazy by constantly asking the same questions over and that his memory wasn't as long as her little finger.

The annual report of appellee as guardian for her mother was offered in evidence.

Appellant Aljurita Williams offered to testify that on the day the will was signed she saw bloody cotton and rags and a slop jar of blood outside testator's house; also that Mr. Carsner did return to testator's home on the day of but after the will was signed, this having been denied by Mr. Carsner.

Appellant Noma Sayles offered to rebut testimony as to when counsel was employed to contest the will, this to rebut testimony offered by appellee.

Much of the excluded evidence was merely cumulative of evidence admitted, the verity of which we have assumed, and hence if erroneously excluded the errors are harmless.

 All statements made by appellee before the execution of the will and offered as admissions against interest were not admissible as such since at such time she had no interest in the properties involved. Reynolds v. Porter, Tex.Civ.App., 54 S.W. 2d 1086.

The remaining evidence offered, not included in the above two classifications, does not, if added to the evidence admitted, change our views that the instructed verdict was proper and any error committed in excluding such evidence is harmless.

Appellants moved to strike, as voluntary, the statement of a witness that testator was assaulted by his son. The failure of the court to do so was harmless as the same testimony was otherwise introduced.

The trial court properly sustained exceptions to appellant's petition wherein it was alleged that appellee had, before she returned to the home of her parents, lived a profligate and immoral life. Grant v. Pendley, Tex.Civ.App., 39 S.W.2d 596, 78

In order to dispose of the questions A.L.R. 638.

raised in this appeal it has been necessary to write at length about the facts. The pertinent rules of law are well established and the parties only disagree as to their application to the facts. We have, therefore, in the interest of brevity, not cited nor quoted from decisions stating the law as to what constitutes undue influence, mental incapacity to make a will, or as to how a directed verdict should be reviewed.

We have found no reversible error and conclude by affirming the judgment of the trial court.

Affirmed.